(32 P.3d 1226)

No. 85,497

STATE OF KANSAS, *Appellee,* v. KAPELLE D. SIMPSON, *Appellant.*

—

Opinion filed October 5, 2001.

*Richard Ney*, of Law Offices of Richard Ney, of Wichita, for appellant.

*Lesley A. McFadden, Debra S. Peterson,* and *Boyd K. Isherwood,* assistant district attorneys, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, for appellee.

Before RULON, C.J., GREEN, J., and ROGG, S.J.

GREEN, J.: Kapelle D. Simpson appeals his conviction by a jury of sale of cocaine. On appeal, Simpson argues that the trial court erred by (1) failing to obtain a knowing and voluntary waiver of his right to a 12-person jury; (2) failing to inquire as to the nature of his conflict with defense counsel; (3) allowing a witness to invoke his Fifth Amendment rights in the presence of the jury; (4) cross-examining him on a key issue of the case; (5) admitting prejudicial rebuttal evidence; (6) allowing inadmissible hearsay into evidence; and (7) failing to properly instruct the jury. We reverse and remand for a new trial.

During an undercover investigation, Officer Anna Hatter met Oliver Pittman. Pittman brokered several drug sales between Officer Hatter and various individuals, including Shawn Hampton, Simpson's cousin. On November 20, 1998, Hatter called Pittman to purchase crack cocaine. According to Hatter, Pittman handed the phone to another individual whom he referred to as "Love," later identified as Simpson. Love told Officer Hatter to have Pittman call him when she arrived at Pittman's apartment, and he would bring the crack to her.

Hatter then assembled a narcotics team and prepared the surveillance equipment before going to Pittman's apartment. When she arrived, there were four other people at Pittman's apartment to purchase drugs. Pittman placed a call to someone whom Hatter assumed was Love. After waiting awhile, Hatter complained to Pittman that Love was taking too long to arrive with the drugs. Pittman

responded that it would not take Love much longer to get there because Love lived with Hampton, who had sold crack to Hatter on previous occasions and had not taken much time to deliver the drugs.

While Officer Hatter was at Pittman's apartment, there was a knock on the back door of the residence, and Love entered the kitchen. Hatter went to the kitchen where Love was speaking on a cell phone. Hatter testified that Love opened his hand, revealing three rocks of crack wrapped in plastic. Hatter paid Love $60 for the drugs.

When Hatter left Pittman's apartment, she radioed Love's description so that Officer Frank Cook, a uniformed officer, could do a patrol stop in order to identify the suspect. Officer Cook was instructed not to arrest the suspect at this time so that the detectives could further their investigation. When Officer Cook stopped Love's car, the driver produced both Kansas and Missouri driver's licenses which identified him as Kapelle Simpson. In addition, the car registration indicated that the car was registered to Kapelle Simpson. After the undercover investigation was completed, Simpson was charged with and convicted of sale of cocaine.

*Waiver of 12-Person Jury*

Simpson argues that the trial court committed reversible error when it failed to advise him of his right to a 12-person jury. Specifically, Simpson argues that the trial court's failure to advise him of his right to a 12-member jury resulted in his waiver of that right. The question of whether Simpson knowingly and voluntarily waived his right to a jury of 12 persons is a question of fact and, as a result, we review the record to determine whether substantial competent evidence supports the trial court's finding. See *State v. Stuber*, 27 Kan. App. 2d 160, 163, 1 P.3d 333, *rev. denied* 269 Kan. 940, *cert. denied* 531 U.S. 945 (2000).

To determine whether Simpson knowingly and voluntarily waived his right to a 12-person jury, it is necessary to set out the events preceding the waiver. The third day of Simpson's trial began with Simpson notifying the court that he was having problems with his attorney:

"THE COURT: We're back on the record in the Simpson matter.

"THE DEFENDANT: Could I speak to you, Your Honor, because I'm having some problems with —

"THE COURT: Well, we're going back on the record in the Simpson matter, and Mr. Simpson, you have something to say?

"THE DEFENDANT: Yes, I do, Your Honor. Me and my attorney are having disagreements on certain issues that needs to be addressed to the Court, like the paper that the prosecution presented to the officer that he gave to his detective — I mean gave — the officer gave to a detective to give to the leading officer in this case, his leading witness, he gave her this paper, this paper was never given to us.

"When we finally get this paper, this paper has at the bottom of it this court be Smoke, yet still this officer, he's the one who claimed to have written it, didn't write no date on it, no time, he gave this paper to them. If this said this could be Smoke on it, they know I'm Mr. Kappelle Simpson, he wouldn't have no doubt in his mind that he knew what he was talking about.

"THE COURT: Well, Mr. Simpson, if you and your attorney have a disagreement over strategy, what ought to be asked or not asked, that's something the two of you need to work out. You know, if you're not happy with the representation you're getting and you don't think that it's possible for you two to proceed, then that's a different question and we're going to have to take action based on that; but just because the two of you don't agree on something doesn't mean that I'm going to necessarily get involved in it. You understand what I'm saying?

"MS. NOLAN [Defense Counsel]: Your Honor, he wants to have that little sheet of paper admitted into evidence.

"THE COURT: Which little sheet of paper specifically are we talking about, that picture?

"THE DEFENDANT: No, the paper that he has claiming that one of his witnesses, Officer Cook, claims to have written the night of the 20th that he gave to surveillance officers Detective Smith. Yes, that.

"MR. MAGANA [The prosecutor]: This is the notes that Officer Cook took at the stop.

"THE DEFENDANT: And you see what it says at the bottom.

"THE COURT: And it has not been admitted into evidence.

"MR. MAGANA: That's correct.

"THE COURT: Are you going to be wishing to do that, Ms. Nolan?

"MS. NOLAN: I wish I could.

"THE COURT: Why can't you?

"MS. NOLAN: It's his [the prosecutor's] piece of paper.

"MR. MAGANA: We'll go ahead and put it in, we'll just put it in with Cook."

The trial court did not ask Simpson whether he had any additional problems with his attorney. Instead, the trial court reported that a juror was ill and unable to continue:

"THE COURT: All right. On to another matter, I've received a communication from the jury coordinator that one of the jurors is very ill . . . . And I've asked both counsel if they have any objection to proceeding with 11 jurors. I assume the State has no objection.

"MR. MAGANA: That's correct, Your Honor.

"THE COURT: And Ms. Nolan, you've indicated you and your client have no objection; is that correct?

"MS. NOLAN: That's correct, Your Honor.

"THE COURT: Now, Mr. Simpson, I assume that's true, you have no objection; is that right?

"THE DEFENDANT: Yes.

"THE COURT: Yes, you have no objection?

"THE DEFENDANT: Yes, no objection.

"THE COURT: And you've also written that out here; is that correct?

"THE DEFENDANT: That's correct.

"THE COURT: And you've signed and dated it on this date; is that correct?

"THE DEFENDANT: That's correct.

"THE COURT: Then we are going to proceed with 11 jurors."

The trial court then went on to address the presentation of the State's rebuttal evidence. During this discussion, Simpson interjected, "I got a question," and his attorney said, "Just ask me." The trial judge told Simpson, "You just need to visit with your attorney. Okay."

After his conviction, Simpson moved for a new trial alleging that the trial court failed to advise him of his rights before waiving a 12-person jury. At the hearing on the motion for a new trial, Simpson explained to the trial court that his attorney did not advise him of his rights regarding the jury:

"She didn't give me any [advice], that's my whole — she didn't tell me that if I keep arguing and arguing or even — I didn't even know I didn't have to argue, that I could have got a new trial and a new jury. I wouldn't have wanted to proceed with only 11 jurors, that one juror could have been the juror that, you know, that could have made a hung jury or believed my side of the story or anything. I never was explained anything by her."

Nolan testified that her advice to Simpson consisted of the following:

"I told him that we were missing a jury, that one of the jury was sick. And he says what does that mean. And I responded and said that it would be a mistrial and we'd have a new trial or he could proceed with an 11 person jury. I did not give him any further advice or any further information."

The trial court denied Simpson's motion for a new trial after finding as follows:

"It might be that we could have gone into great detail on the record with Mr. Simpson as to what he was doing in waiving his right to a new trial, but I'm going to make the finding that based on the testimony of Ms. Nolan that he in fact knew that he could either get a new trial or proceed with an 11 person jury. I think his waiver was knowing and voluntary."

On appeal, Simpson argues that this record does not demonstrate a knowing and voluntary waiver of his right to a 12-person jury. Simpson's specific complaint is that the trial court did not personally convey to him that he had a right to a 12-member jury and the significance of waiving that right.

K.S.A. 22-3403(2) provides: "A jury in a felony case shall consist of twelve members. However the parties may agree in writing, at any time before the verdict, with the approval of the court, that the jury shall consist of any number less than twelve."

A defendant's right to assent to less than 12 jurors is derived from the right to waive a jury trial. *State v. Roland*, 15 Kan. App. 2d 296, 298, 807 P.2d 705 (1991). In *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 (1975), our Supreme Court discussed the test for determining the validity of a jury trial waiver:

"Since the right to trial by jury is constitutionally preserved, waiver of the right should be strictly construed to afford a defendant every possible opportunity to receive a fair and impartial trial by jury. It is provided by statute in this state that a jury trial may be waived in any criminal trial where the defendant, the state, and the trial court assent to such waiver. [Citations omitted.] We have stated the test for determining the validity of a waiver of the right to a jury trial is whether the waiver was voluntarily made by a defendant who knew and understood what he was doing. [Citation omitted.] Whether this test is satisfied in any given case will depend on the particular facts and circumstances of that case, but a waiver of the right to a jury trial will not be presumed from a silent record. [Citation omitted.]"

The *Irving* court went on to state: " 'The court should not accept a waiver unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record.' " 216 Kan. at 590.

Although *Irving* requires a trial court to advise a defendant of his or her right to a jury trial, the extent of the inquiry that is sufficient has not been fully addressed in Kansas. However, a case involving the waiver of the right to a 12-person jury has touched on·the question. In *State v. Hood*, 242 Kan. 115, 744 P.2d 816 (1987), the defendant argued that the trial court should have declared a mistrial after discovering that a juror was subject to a pending murder charge. The *Hood* court held that the defendant's waiver of a 12-person jury was knowing because the trial court advised the defendant of his options of proceeding with 11 jurors or opting for a mistrial. The *Hood* court found that an intelligent waiver was made even though the trial court did not use the phrase "right to a jury trial" in advising the defendant of his options.

Our Supreme Court has found the waiver of a jury trial to be intelligent even though the trial court's colloquy with the defendant was brief, provided the trial court informed the defendant that he or she had a right to a jury trial. See, *e.g., State v. Fisher*, 257 Kan. 65, 73, 891 P.2d 1065 (1995) (holding the defendant knowingly and voluntarily waived his right to a jury trial after the trial court informed the defendant of his constitutional right to a jury trial and that by waiving that right the trial judge would determine whether he was guilty); *State v. Blanton*, 203 Kan. 81, 87, 453 P.2d 30 (1969) (holding the defendant knowingly and voluntarily waived his right to a jury trial after the trial court advised him of his right to a jury trial).

The Florida Supreme Court noted the following regarding the content of the trial court's colloquy with the defendant before accepting a waiver of the right to jury trial:

"An appropriate oral colloquy will focus a defendant's attention on the value of a jury trial and should make a defendant aware of the likely consequences of the waiver. If the defendant has been advised by counsel about the advantages and disadvantages of a jury trial, then the colloquy will serve to verify the defendant's understanding of the waiver. Executing a written waiver following the colloquy reinforces the finality of the waiver and provides evidence that a valid waiver occurred. Because the waiver of a fundamental right must be knowing and intelligent, the above-stated practice better promotes the policy of recognizing only voluntary and intelligent waivers." *Tucker v. State*, 559 So. 2d 218, 220 (Fla. 1990).

We find that the trial court erred in failing to personally advise Simpson of his right to a 12-person jury. As noted previously, *Irving*, 216 Kan. 588, requires the trial court to advise a criminal defendant of his or her right to a jury trial before accepting a waiver from the defendant. Such an advisement did not occur in this case because the trial court merely asked Simpson whether he objected to an 11-person jury. Asking Simpson whether he objected to an 11-member jury falls far short of advising him of his right to a jury of 12 jurors. Moreover, the trial court should not have shifted the responsibility of advising Simpson of his right to a 12-person jury to defense counsel.

At the very least, the trial court was required to advise Simpson of his right to a 12-person jury. The trial court should have also explained to Simpson that he had the option of continuing with an 11-member jury or opting for a mistrial. Because the trial court failed to advise Simpson of his right to a 12-person jury, he did not possess the necessary information to make a knowing and voluntary waiver of that right. Moreover, we cannot say that the trial court's error in failing to advise Simpson of the right to a 12-person jury is harmless because the right to a jury of 12 jurors is a fundamental right. See *State v. Morfitt*, 25 Kan. App. 2d 8, 12, 956 P.2d 719, *rev. denied* 265 Kan. 888 (1998). As a result, we have no alternative but to reverse and remand this case for a new trial.

*Failure to Inquire About Conflict with Defense Counsel*

Simpson further contends that the trial court erred in failing to inquire as to his conflict with defense counsel. Our standard of review is whether the trial court abused its discretion in failing to inquire as to the potential conflict between Simpson and his attorney. See *State v. Taylor*, 266 Kan. 967, 978, 975 P.2d 1196 (1999).

It is the task of the trial judge to insure that a defendant's Sixth Amendment right to counsel is honored. *State v. Cromwell*, 253 Kan. 495, 507, 856 P.2d 1299 (1993), *modified on other grounds State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993). Irreconcilable conflict between a defendant and his or her attorney may, in certain circumstances, require the appointment of substitute counsel to protect the defendant's Sixth Amendment right to effective assis-

tance of counsel. The complete breakdown of communication between an attorney and his or her client may evidence an irreconcilable conflict that requires appointment of substitute counsel. 253 Kan. at 500.

Simpson argues that the trial court erred in failing to inquire about the conflict and that such an error violates his Sixth Amendment right to effective assistance of counsel. In *State v. Richardson*, 256 Kan. 69, 883 P.2d 1107 (1994), the defendant argued the trial court's inquiry into the conflict with his counsel was insufficient. The *Richardson* court found that the trial court did not abuse its discretion in failing to appoint new counsel. In reaching this decision, the *Richardson* court noted that the trial court asked the defendant to explain why he was unsatisfied with his counsel. The *Richardson* court also noted that although the trial court found the defendant's dissatisfaction was without merit, the court afforded the defendant and counsel time to try to come to an understanding so the attorney-client relationship could be maintained. 256 Kan. at 82.

The problem here, however, is that the trial court did not allow Simpson an opportunity to explain his perception of the conflict. The United States Supreme Court has indicated that where the trial court becomes aware of a possible conflict of interest between an attorney and client, the trial court must inquire. *Wood v. Georgia*, 450 U.S. 261, 272, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981). The *Wood* court explained:

"[T]he record does demonstrate that the possibility of a conflict of interest was sufficiently apparent at the time of the . . . hearing to impose upon the court a duty to inquire further. . . . Any doubt as to whether the court should have been aware of the problem is dispelled by the fact that the State raised the conflict problem explicitly and requested that the court look into it." 450 U.S. at 272-73.

The *Wood* Court also characterized an earlier decision, *Cuyler v. Sullivan*, 446 U.S. 335, 347, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980), as "mandat[ing] a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.' " 450 U.S. at 272 n.18.

Our Supreme Court relied on *Wood* in *Taylor*, 266 Kan. at 979. At Taylor's sentencing hearing, defense counsel informed the court that Taylor said he had spoken with "a couple of attorneys" and his family was interested in securing their services for Taylor's continued representation. The trial court did not inquire as to the reasons for Taylor's request for time to secure alternate counsel and overruled the request, stating that Taylor could represent himself if he wanted to. Defense counsel made no further arguments on Taylor's behalf.

On appeal, Taylor argued that the trial court's summary denial of his request for a continuance to secure new counsel violated his Sixth Amendment right to counsel. The *Taylor* court noted: "The problem here is that the district court never allowed Taylor an opportunity to explain his perception of the alleged conflict before denying the request for new counsel." The court went on to state that "[t]he district judge failed to make any inquiry as to the problems between Taylor and [defense counsel]. Were they imagined or real? The record contains no inquiry from the bench regarding the adequacy of Taylor's representation." 266 Kan. at 975. The *Taylor* court concluded that "[w]here a trial court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further." 266 Kan. at 979. See *State v. Jenkins*, 257 Kan. 1074, 1084, 898 P.2d 1121 (1995) ("[W]here the trial court is advised of the possibility of a conflict by either the defendant or the State, the court is required to initiate an inquiry to insure that the defendant's Sixth Amendment right to counsel is not violated."); *State v. Mosley*, 25 Kan. App. 2d 519, 956 P.2d 848 (1998), *overruled on other grounds State v. Jasper*, 269 Kan. 649, 653-54, 8P.3d 708 (2000) (holding it is an abuse of discretion when the trial court, after becoming aware of a potential conflict between an attorney and client, fails to inquire further).

Here, the trial court did not give Simpson an adequate opportunity to explain the perceived problems with his attorney. Simpson informed the court that he was having "disagreements on certain issues" with his attorney. Although the trial court allowed Simpson to explain why he believed a certain piece of evidence should have

been admitted, the trial court did not ask Simpson whether the evidentiary issue was the extent of his problem. Moreover, the trial court reasonably should have known that Simpson's conflict with defense counsel had not been resolved when Simpson announced that he had a question. Rather than addressing Simpson, the trial court swiftly referred him to defense counsel. The trial court's failure to more fully inquire into Simpson's alleged problems with defense counsel was an abuse of discretion.

### Allowing Witness to Invoke Fifth Amendment Rights in Presence of the Jury

Simpson further argues that the trial court erred in allowing a State witness to exercise his Fifth Amendment rights in the presence of the jury.

Simpson's defense theory was mistaken identity—that Hampton was the individual who sold drugs to Officer Hatter and was stopped by Officer Cook on the evening in question. As noted previously, Hampton allegedly sold drugs to Officer Hatter on several occasions and was a subject of the undercover investigation. The State decided to call Hampton as a rebuttal witness to show the jury the physical differences between Simpson and Hampton and to demonstrate that Officers Hatter and Cook could differentiate between the two individuals.

The State told the trial court that Hampton would likely invoke his Fifth Amendment rights if called. In addition, defense counsel expressed her concern that Hampton not invoke his Fifth Amendment rights before the jury. Despite warnings from both counsel, the trial court failed to admonish Hampton or his attorney not to invoke Hampton's Fifth Amendment rights in front of the jury. As a result, the following proceedings occurred in the presence of the jury:

"MR. MAGANA: Your Honor, State would call Shawn Hampton, a/k/a Roland Bishop, to the witness stand.

"MR. LEON [Hampton's attorney]: Your Honor, at this time I'd like to note for the record —

"THE COURT: Go ahead, Mr. Leon.

"MR. LEON: Yes, Your Honor. At this time I would like to note for the record that although Mr. Hampton is being called as a rebuttal witness in this matter,

that he'll plead the Fifth and we request that there be no other questions asked other than his name. There was a mention here as [an] a/k/a Roland Bishop, that was not my understanding as to what his presence of the proceeding would be.

"THE COURT: Well, I'm going to allow Mr. Magana to ask him what his name is and beyond that I'm not going to allow any questions. I wasn't aware that he was going to mention a/k/a either, but I don't think any prejudice has been done to Mr. Bishop's case."

In *State v. Crumm*, 232 Kan. 254, 654 P.2d 417 (1982), the defendant attempted to call a witness who was not charged with participating in the offense in which the defendant was being tried, but the possibility of charges being brought against that witness were very real. The witness, through counsel, clearly informed the trial court and trial counsel that she would refuse to answer questions that might incriminate her based on her Fifth Amendment rights. The *Crumm* court held that "[i]t is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege." 232 Kan. 254, Syl. ¶ 1.

*Crumm* quoted American Bar Association Standards of Criminal Justice, Relating to The Prosecution Function, Standard 4-5.7(c), and Relating to the Defense Function, Standard 3-7.6(c). The court noted that the commentaries to those standards indicate that claims of privilege are preferably determined outside the presence of the jury, since undue weight may be given by a jury to the claim of privilege and due to the impossibility of cross-examination as to its assertion. 232 Kan. at 258. The *Crumm* court found additional dangers inherent in allowing a witness to invoke Fifth Amendment claims before a jury:

" 'Further, a witness's reliance on the Fifth Amendment "may have a disproportionate impact upon the minds of the jurors." [Citation omitted.] "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the . . . fact that it is a form of evidence not subject to cross-examination." [Citation omitted.] Because the impact of a witness's refusal to testify outweighs its probative value, "[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." [Citations omitted.]' " 232 Kan. at 260 (quoting *Com. v. Hesketh*, 386 Mass. 153, 434 N.E.2d 1238, 1241-42 [1982]).

Our Supreme Court also addressed this issue in *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983). The *Lashley* court established a procedural rule whenever a witness informs either the defense or the prosecution that he or she intends to claim a Fifth Amendment privilege: "In the future trial courts should not proceed in this manner. Claims of privilege should be determined outside the presence of the jury, since undue weight may be given by a jury to a claim of privilege." 233 Kan. at 626.

Here, the trial court was on notice that Hampton would likely invoke his Fifth Amendment privilege against self-incrimination. Despite this possibility, the trial court failed to ask Hampton or his attorney outside the presence of the jury whether he would claim his Fifth Amendment rights. We find that the trial court erred in failing to admonish Hampton and his attorney not to invoke Hampton's Fifth Amendment rights in the presence of the jury.

The trial court further erred in analyzing whether Hampton's claim of Fifth Amendment privilege in the presence of the jury prejudiced Hampton. Rather, the trial court should have determined whether the claim of privilege prejudiced Simpson.

## Cross-examination by the Trial Court

Simpson additionally contends that the trial court committed reversible error when it questioned him during surrebuttal and when it suggested that his written waiver be introduced into evidence as a handwriting exemplar. Although this issue may not have been properly preserved since Simpson failed to object to the trial court's actions, this court has the power to consider the issue when "necessary to serve the interests of justice or to prevent a denial of fundamental rights." See *State v. Clemons*, 251 Kan. 473, 483, 836 P.2d 1147 (1992).

Simpson's surrebuttal testimony was aimed at countering the State's evidence that Simpson was the individual who sold drugs to Officer Hatter and was stopped by Officer Cook after the sale. As noted previously, Officer Cook testified during the State's case in chief that the individual he stopped after the drug sale produced both Kansas and Missouri driver's licenses. During surrebuttal, however, Simpson testified that he had a Kansas identification card

but did not have a Kansas driver's license. The State introduced a Kansas driver's license issued for Kappelle Simpson. Simpson testified that he was not the person depicted in the photograph on the Kansas driver's license. The trial judge then interrupted cross-examination and asked Simpson if the signature on the Kansas identification card was his. Simpson stated that it was. When the State completed its cross-examination, the trial judge posed additional questions to Simpson:

"THE COURT: Mr. Simpson?
"THE WITNESS: Yes.
"THE COURT: Do you remember you wrote out a statement saying you're willing to proceed to trial with 11 persons?
"THE WITNESS: Yes.
"THE COURT: Did you write that whole thing?
"THE WITNESS: Yes.
"THE COURT: Did you sign it?
"THE WITNESS: Yes.
"THE COURT: I'm going to have counsel approach."

During the bench conference, the trial judge told counsel: "I'm going to have one of you mark that [Simpson's written waiver] and offer it into evidence so they can study the signature." The State then marked the waiver as an exhibit, and the trial court admitted it into evidence without objection from Simpson. By suggesting that the waiver be introduced into evidence, the trial judge gave the jury a mechanism to compare Simpson's signature on the written waiver with the signature on the Kansas driver's license.

A trial judge's improper comments require a reversal of a conviction when it "affirmatively appear[s] that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party." *State v. Nguyen*, 251 Kan. 69, Syl. ¶ 4, 833 P.2d 937 (1992). However, the mere possibility of prejudice from a remark will not result in a reversal where an interpretation can reasonably be given to the remark that would render it unobjectionable. *Plains Transport of Kansas, Inc. v. Baldwin*, 217 Kan. 2, 10, 535 P.2d 865 (1975).

Our Supreme Court, in discussing the role of the trial judge, has stated:

"In recognizing the right of a trial judge to cross-examine witnesses we have always coupled such recognition with words of warning. . . . [W]here the judge deems it necessary to cross-examine witnesses, he must exercise great care to prevent giving the jury the impression that he is biased against the defendant and he must not forget the function of a judge and assume that of an advocate. The same rule applies with respect to the credibility of a witness and a judge should exercise great care and caution to say nothing within the hearing of the jury which would give them an indication of what he thought about the truth or falsity of any part of the testimony. . . . These admonitions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact." *State v. Boyd*, 222 Kan. 155, 158-59, 563 P.2d 446 (1977).

The *Boyd* court held that the trial court did not err in propounding a question to a medical expert because the trial court did not assume the role of an advocate nor did the judge's question prejudice the defendant. Moreover, the trial judge allowed both counsel to inquire further following the question and gave an instruction to the jury that he did not intend, by any of his actions or remarks, to suggest how he would resolve the case. 222 Kan. at 159-60.

A more egregious statement by the trial court was addressed in *State v. Chappell*, 26 Kan. App. 2d 275, 987 P.2d 114, *rev. denied* 268 Kan. 890 (1999). The *Chappell* court found that the trial court committed reversible error when it commented on a witness' veracity during an interrogation in the presence of the jury. The court found that the error was reversible because the case was closely balanced and because the trial court's comments substantially prejudiced the defendant's right to a fair trial. 26 Kan. App. 2d at 280.

Allegations of judicial misconduct must be decided based upon the surrounding facts and circumstances. *State v. Stoops*, 4 Kan. App. 2d 130, 132, 603 P.2d 221 (1979). Here, the surrounding facts and circumstances reveal that this was an extremely close case in which the jury was primarily required to weigh the evidence on identity. Accordingly, it was critical that the trial judge say nothing that would give the jury the impression that he believed Simpson was the individual who sold drugs to Officer Hatter on the evening in question. By questioning Simpson and suggesting that his waiver

be introduced into evidence, the trial court improperly lent its exalted weight to the State's theory of identity in a closely balanced case. Under these circumstances, the trial court's questions during surrebuttal substantially prejudiced Simpson's right to a fair trial.

## Prejudicial Rebuttal Evidence

Next, Simpson argues that the trial court erred in allowing the State to introduce prejudicial rebuttal evidence. Simpson's specific argument is that the trial court abused its discretion in allowing rebuttal evidence regarding the drug sales between Officer Hatter and Hampton. Simpson, however, failed to preserve this issue by making a contemporaneous objection.

" 'A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404 states that a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection. [Citation omitted.]' " *State v. Sims*, 265 Kan. 166, 174, 960 P.2d 1271 (1998).

Because Simpson failed to object to the evidence regarding drug sales between Officer Hatter and Hampton, this issue was not properly preserved for appeal.

## Hearsay Evidence

Simpson additionally contends that the trial court erred in admitting a hearsay statement over his objection. The admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

During Simpson's trial, Officer Hatter testified that she had complained to Pittman about the amount of time it was taking Pittman's drug connection to arrive with the drugs. Over Simpson's objection, Hatter testified that Pittman said it would not take Love long to get there because Love lived with Hampton, who had sold crack to Hatter on previous occasions and had not taken much time

to deliver the drugs. In response to Simpson's objection, the State argued that the statement was admissible as res gestae or as a statement in furtherance of a conspiracy. The trial court overruled Simpson's objection without specifying a basis for the determination.

Later in her testimony, Hatter testified that "[o]n seven to eight different occasions it was necessary for me to surveil Mr. [Hampton] and in so doing, due to the fact that I'm assuming that they lived together, I saw Mr. Simpson several times during that surveillance." The State had Hatter repeat the hearsay:

"Q. Now, who had told you that [Hampton] lived with Mr. Simpson?
"A. Ollie had told me that.
"Q. Oliver Pittman?
"A. Correct."

On appeal, Simpson argues that Pittman's statement was inadmissible as evidence in furtherance of a conspiracy. K.S.A. 60-460(i) provides, in part, as follows:

"As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination . . . ."

"Where the declaration has a hearsay quality and is admissible under this subsection as a hearsay exception, there must be evidence that a conspiracy actually existed." 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(i), Comments, p. 255 (1979).

In *State v. Bird*, 238 Kan. 160, 175-76, 708 P.2d 946 (1985), our Supreme Court discussed five prerequisites for utilizing the coconspirator hearsay exception:

"(1) [T]he person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been outside the presence of the accused; (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter."

The *Bird* court went on to note that "even if all five of these elements are satisfied, the testimony is not admissible unless evidence,

other than the proffered out-of-court statement, is already in the record which establishes a 'substantial factual' basis for a conspiracy between the defendant and the declarant. [Citations omitted.]" 238 Kan. at 176.

The evidence in this case showed that a conspiracy existed between Simpson and Pittman. Officer Hatter testified that Pittman charged $10 for brokering drug sales. Accordingly, Pittman's statement that Simpson and Hampton lived together was in furtherance of the conspiracy between Simpson and Pittman because by telling Hatter who Simpson lived with, Pittman persuaded Hatter to wait for Simpson, thus earning Pittman $10 for brokering the sale.

Moreover, the five prerequisites noted in *Bird* are fulfilled in this case. First, the person testifying about the hearsay statement, Officer Hatter, was a third party. In addition, the out-of-court statement was made by a coconspirator, Pittman, and was made outside Simpson's presence. Moveover, the statement was made while the conspiracy was in progress. Furthermore, the statement was relevant to the conspiracy because, by making the statement, Pittman was attempting to persuade Officer Hatter to wait so that the drug sale could be completed. Finally, the independent factor of whether evidence, other than the proffered out-of-court statement, was already in the record which established a substantial factual basis for the conspiracy between Simpson and Pittman, is also fulfilled. Before her testimony regarding the hearsay statement, Officer Hatter testified that she had spoken with Pittman and arranged a drug purchase with Simpson.

As a result, the trial court did not err in admitting into evidence Pittman's out-of-court statement that Simpson and Hampton lived together because the hearsay statement was admissible as a statement in furtherance of a conspiracy.

*Jury Instruction on Eyewitness Identification*

Simpson argues that the trial court erred in failing to instruct the jury on eyewitness identification. However, Simpson did not object to the trial court's failure to give the eyewitness identification instruction. As a result, our standard of review is whether the failure to give the instruction was clearly erroneous. "Instructions

are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

Simpson claims that because identification was a critical issue of the case, the trial court was obligated to give PIK Crim. 3d 52.20 (1999 Supp.) on eyewitness identification. The instruction reads as follows:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness."

Factors that may be considered in weighing eyewitness identification testimony include the witness' opportunity to observe, whether the witness observed the defendant on earlier occasions, and the witness' emotional state. PIK Crim. 3d 52.20 (1999 Supp.).

In *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), our Supreme Court set forth rules of law applicable to facts attending eyewitness identification. The *Warren* court noted that if "eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony." 230 Kan. at 397.

Here, the factual circumstances warranted a cautionary instruction on eyewitness identification. Officer Hatter testified that she saw the individual who sold her drugs on November 20, 1998, for only 60 seconds. In addition, Officer Hatter testified that the first time she saw the individual she later identified as Simpson was November 20, 1998. Moreover, Officer Hatter witnessed the suspect in a dimly lit kitchen while the individual's facial features were obstructed by a cell phone and a hat. Furthermore, Officers Hatter and Cook both indicated that they did not notice whether the suspect had any gold teeth. Simpson has numerous gold teeth. In addition, Officer Hatter may have been nervous during the drug sale because it took Love, who was previously identified as Simp-

son, a long time to arrive with the drugs, because she did not have money to pay Pittman for brokering the deal, and because several drug buyers were in the apartment during the sale.

Because identification of Simpson was a key issue in this case, the trial court's failure to give PIK Crim. 3d 52.20 (1999 Supp.) left the jury without the guidance necessary to judge the evidence in this case. We find a real possibility that the jury would have rendered a different verdict had the trial court instructed on eyewitness identification. As a result, the trial court's failure to instruct on eyewitness identification was clearly erroneous.

Affirmed in part, reversed in part, and remanded for a new trial.