NOT DESIGNATED FOR PUBLICATION

No. 125,932

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID LEON FRY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Butler District Court; JANETTE L. SATTERFIELD, judge. Submitted without oral argument. Opinion filed May 15, 2026. Reversed and remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Cheryl M. Pierce*, assistant county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., SCHROEDER and ISHERWOOD, JJ.

ISHERWOOD, J.: David Leon Fry stands convicted of aggravated criminal sodomy with a child under the age of 14 years for acts perpetrated against his stepdaughter. At trial, the district court judge interjected numerous times by questioning four prosecution witnesses during their testimony. Fry now appeals and raises several trial errors for our consideration, including a claim that the district court judge committed judicial error in questioning witnesses. Based on our review of the record, we agree that the district court judge's questioning of the witnesses constituted improper judicial comment. Moreover, we are not convinced that the State has established that this error was harmless.

1

Accordingly, we reverse Fry's conviction and remand this case to the district court for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

Fry entered a long-term relationship with T.M.'s mother (Mother) sometime in 2020. After Fry and Mother married, T.M.'s maternal grandmother (Grandmother) discovered that Fry was a registered sex offender and told Mother that Mother should have informed the family sooner. Fry and Mother lived in a van parked in front of Grandmother's house, while T.M. slept in the house with Grandmother.

One day, when T.M. was six years old, Fry picked up T.M. after school and they went fishing together. After fishing, Fry dropped off T.M. with Grandmother. As they were getting ready for bed, T.M. disclosed to Grandmother that Fry "made her suck his dick." Grandmother called the police, and police arranged for T.M. to have a forensic interview at the child advocacy center and a sexual assault nurse examination (SANE).

During the forensic interview, T.M. made no disclosure of sexual abuse, instead telling the interviewer that she felt safe with Fry. The interviewer took three breaks from the interview to discuss with police how to obtain a disclosure from T.M. The interviewer also brought up T.M. being at the lake and asked her, "if she had told someone . . . that something had happened, that they would be concerned about her," to which T.M. responded, "'no.'" Following the interview, the interviewer told Grandmother that T.M. made no disclosure of abuse.

Grandmother then drove T.M. to her SANE. T.M. told the nurse her "'dad'" made T.M. "'suck his dick.'" T.M. said the abuse occurred under a bridge while they were fishing at a new spot. In response to questions posed by the nurse, T.M. told the nurse Fry's penis was "hard" and that "green goo" came out of the top of it. T.M. said she

2

remained dressed, as did Fry except that he pulled his pants down. The nurse observed that T.M. had "abrasions and bruising on her knees" and noted that T.M. reported that she fell while at the lake with Fry. The nurse also obtained DNA samples from T.M. and collected her clothes for DNA testing by the Kansas Bureau of Investigation (KBI).

Police interviewed Fry, who said that he took T.M. to El Dorado Lake to go fishing at an area called "the rock quarry." The detective testified that the area where Fry indicated the two went fishing was "fairly opened" and not secluded or surrounded by trees. When asked if there was a bridge where the two were fishing and if T.M. had fallen, Fry responded negatively to both questions. Fry said he returned T.M. to Grandmother's home at about 8 p.m. After the interview, Fry emailed the detective that the allegations were false and that T.M.'s family "had put things in [T.M.]'s head."

The detective later took T.M. to the lake to identify where the alleged incident had happened. They went to the rock quarry area first and T.M. acknowledged she had been there before but not with Fry. While the detective was driving, T.M. identified an area familiar to her—which was a different location from the rock quarry—and directed the detective to pull over and park. The detective testified that the area was "very secluded" and "overgrown," and there was a bridge on which T.M. identified graffiti she had seen from being at the location before.

The State charged Fry with aggravated criminal sodomy of a child under the age of 14 years. Before trial, the State moved to admit Fry's prior Oklahoma conviction for lewd molestation as propensity evidence. The allegations in the Oklahoma lewd molestation case involved Fry inappropriately touching a 15-year-old girl while she was a guest at a sleepover at Fry's house. Fry pleaded no contest to lewd molestation in the case. The district court ruled that the evidence was relevant, probative, and admissible under K.S.A. 60-455(d), reasoning that both cases involved Fry having access to female minors in the residence and that the probative value outweighed any prejudice. However,

3

the district court limited the propensity evidence to only the journal entry of the prior conviction.

During voir dire, the district court judge made comments to the jury related to COVID-19. She observed that no prospective juror was wearing a mask and mused, "I presume that everyone that wants to be immunized has. I also, presume that there are people who are antimask." The judge went on to explain that she required Fry to wear a mask because, "He comes from the jail. And he is in close quarters with a lot of people." She then described that the panel of potential jurors would be reduced to 12 jurors and 2 alternates: "This is an important enough case that we don't want to have a mistrial or have to retry a case," explaining that two alternates would be "on standby to replace any jurors" if someone got sick or needed to be excused for any reason.

The detective, forensic interviewer, and SANE nurse testified at trial. T.M. also testified, explaining that something uncomfortable happened at the lake and she told Mother's sister (Aunt) and Grandmother about it. On direct examination, the State elicited the following testimony from T.M.:

> "Q. What did you tell your grandma?
> "A. He made me suck—(trails off)—
> . . . .
> "Q. Okay. Did he make you suck some part of his body?
> "A. (Nods head up and down.)
> . . . .
> "Q. . . . What part of his body was it he made you suck? Did—
> "A. His—
> "Q. Go ahead.
> "A. —dick.
> "Q. Okay. Did you say—what did you say? I want to make sure I understand what it is that you said, [T.M.]. Because you said it very low. Okay. Can you repeat it?
> "A. Yes.

4

"Q. Okay. Can you tell us what he made you suck?

"A. D-I-C-K.

"Q. Did you say, D-I-C-K?

"A. Yes.

"Q. Okay. Do you know what that spells?

"A. (Shakes head side to side.)

"Q. Okay. All right. Now, [T.M.], is that what happened at the lake?

"A. Yes."

Mother also testified. She explained that she met Fry through a dating website while he lived in Oklahoma and she moved T.M. with her to be with Fry. Shortly after, Fry, Mother, and T.M. moved to Kansas together. Mother could not remember when she learned that Fry was a registered sex offender, but it was before she moved T.M. to Oklahoma to be with him. Mother explained that Aunt texted her to say that "she would do anything to separate [Mother] and [Fry]" and do "anything in her power" to "sabotage" their relationship. Mother testified that she was unsure whether T.M. was telling the entire truth, particularly, she did not know if T.M. was being coached by an adult. Mother indicated that Aunt might have coached T.M. to make the allegations against Fry. Mother went so far as to say, "my sister is a liar."

Mother also testified that T.M. was in the State's custody because of the allegations against Fry and that she only got to see T.M. during court-ordered therapy sessions. Mother felt the State would keep T.M. from her if she did not testify against Fry in support of T.M.'s allegations, elaborating that she felt the State was leveraging her child for her testimony. The prosecutor then asked Mother if she had been threatened to testify, to which Mother responded negatively. The district court judge then asked, "Do you know who your judge is in . . . [the] Child in Need of Care Case," and Mother provided a name. The State then continued questioning Mother.

5

As Mother was starting to exit the witness stand, the district court judge asked Mother if there was a reintegration plan with T.M. in the child in need of care case and began asking her whether there were "things" Mother had to do. Mother affirmed that there was a reintegration plan on file in the case and said she had to do a drug and alcohol evaluation. The judge then asked if there were "certain stipulations before you could have visitation? Like clean UA—." Mother explained the requirements, including urinalyses and therapist approval. The judge's back and forth with Mother elicited from Mother that if she successfully completed the reintegration plan, then she would have further contact with T.M. beyond their therapy sessions. The entire exchange occurred in the presence of the jury.

The district court judge also spoke during the testimony of the KBI forensic expert. The expert testified that she obtained some partial DNA profiles from T.M.'s underwear. When the prosecutor ended direct examination, the judge inquired, "On either of the partial of the underwear, were you able to determine whether or not the contributor was male? On the minor partials?" The expert explained that one swabbing showed a "mixture of three individuals" with no indication of a male and that another swab showed "an indication of male DNA" but "[the] results were insufficient for any comparisons."

When it was time for testimony from the investigating officer who initially responded to the report of child sexual assault, the judge intervened yet again. After the prosecution concluded its direct examination, the judge asked the officer if he "ascertain[ed] the middle initial, or name of the child" to which the officer responded negatively. Later, during the State's direct examination of Grandmother, the judge interjected to ask, "What is her middle name?" in reference to T.M. After Grandmother answered, the prosecutor said, "Judge, I had that question on my list."

6

The jury convicted Fry of aggravated criminal sodomy with a child under the age of 14 years. The district court sentenced him to life in prison, without the possibility of parole for 25 years.

Fry timely appeals.

DISCUSSION

Fry raises six trial errors on appeal: (1) the district court erred in admitting evidence under K.S.A. 60-455(d); (2) the district court judge erred in making comments and posing questions during trial; (3) the prosecutor committed error during the opening statement and closing argument; (4) cumulative error; (5) error in the reasonable doubt instruction; and (6) insufficient evidence for the aggravated criminal sodomy conviction. Because this court finds the district court judge's improper questioning of witnesses during trial, in the presence of the jury, constitutes reversible error, we decline to reach Fry's other issues.

I. *The district court judge committed judicial comment error.*

At the outset, we note that there is nothing in the record tending to indicate that Fry objected to or otherwise questioned the district court judge's conduct in questioning witnesses during trial. However, allegations of judicial comment error and judicial misconduct are reviewable on appeal despite the lack of a contemporaneous objection at trial. See *State v. Boothby*, 310 Kan. 619, 628, 448 P.3d 416 (2019) (judicial comment error); see also *State v. Miller*, 308 Kan. 1119, 1154, 427 P.3d 907 (2018) (applying rule to judicial misconduct pre-*Boothby*). Consequently, we will address the arguments presented by the parties on the merits.

Fry contends that the district court judge committed judicial comment error or judicial misconduct on two separate fronts: first, by making comments to the jury during voir dire and, second, by questioning several witnesses during their testimony. While comments such as those that occurred here during voir dire should be avoided in the future, we find the greater issue is the judge's questioning of witnesses, so our analysis was confined to that claim. Although we do not find that the district court committed judicial misconduct, we do find that the district court committed judicial comment error in questioning the witnesses in the jury's presence.

*Standard of Review*

Fry frames this specific issue as either judicial misconduct or judicial comment error. Erroneous judicial comments made in front of a jury—that are not jury instructions or legal rulings—are known as "'judicial comment error.'" *Boothby*, 310 Kan. at 626. A review of caselaw reflects that the district court judge's alleged error in questioning witnesses is a judicial comment error. See *State v. Blevins*, 313 Kan. 413, 423, 485 P.3d 1175 (2021) (analyzing district judge's interruption and statement during voir dire under the judicial comment error standard); see also *State v. Lyman*, 311 Kan. 1, 33, 455 P.3d 393 (2020) (analyzing judicial misconduct when district judge slept during the trial); *State v. Bowser*, 312 Kan. 289, 297, 474 P.3d 744 (2020) (acknowledging difference in judicial misconduct and judicial comment error and analyzing for judicial misconduct because that is how the defendant framed the issue and the statements were made outside the presence of a jury); *State v. Walker*, 308 Kan. 409, 419, 421 P.3d 700 (2018) (analyzing judicial misconduct when district judge shredded notes from the jury room); *State v. Booto*, No. 122,654, 2022 WL 188282, at *6 (Kan. App. 2022) (unpublished opinion) (analyzing district judge's questioning of witness under the judicial comment error standard).

This court applies a de novo review to potentially erroneous judicial comments that are not jury instructions or legal rulings. *Blevins*, 313 Kan. at 423. The first question we must answer is whether the comment—here, the questioning of witnesses—was erroneous. *Boothby*, 310 Kan. at 627. If the district court judge's comments—or questions in this case—constitute error, this court then determines whether the error is constitutionally harmless, using the test articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). That is, the State, as "'the party benefitting from judicial comment error has the burden to "prove[] beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, i.e., prove[] there is no reasonable possibility that the error affected the verdict."'" *Blevins*, 313 Kan. at 423.

*Judge as Exemplar of Impartiality*

Judges must ensure that jury trials are conducted in a fair and impartial manner:

> "'The trial judge is not merely a moderator but is the governor of the trial. The judge should strive to conduct the trial in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. The judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions.'" *State v. Hayden*, 281 Kan. 112, 125, 130 P.3d 24 (2006).

Presiding over a criminal jury trial is an important task and one that requires a district court judge to act "in a neutral manner." *Bowser*, 312 Kan. at 298. As a result, a district court judge must take steps to safeguard against being viewed by the jury as being an advocate for either party during a trial. See *State v. Kahler*, 307 Kan. 374, 391, 410 P.3d 105 (2018). This is because "jurors afford the presiding judge a great deal of respect and 'can be easily influenced by the slightest suggestion coming from the court, whether

9

it be a nod of the head, a smile, a frown, or a spoken word.'" *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010).

> "'A juror is prone to watch any indication by the judge as to how he [or she] regards any part of the testimony or the credibility of a witness and for that reason a trial judge must scrupulously avoid the slightest indication as to his [or her] personal feelings concerning the matter in issue.' *State v. Winchester*, 166 Kan. 512, 518, 203 P.2d 229 (1949)." *Kemble*, 291 Kan. at 114.

This does not mean that a district court judge may never question a witness. See 291 Kan. at 114 (stating that a trial judge may "examine witnesses based upon the premise that one of the functions of a trial judge is to accomplish the full development of the truth"). But it is a practice we strongly caution against because such action "is fraught with . . . dangerous consequences." *State v. Boyd*, 222 Kan. 155, 159, 563 P.2d 446 (1977). As the Kansas Supreme Court has repeatedly cautioned, if a district judge believes the jury requires clarification of evidence and that "'additional information should be obtained from a witness,'" rather than question the witness, the judge should "'discuss the matter with counsel outside the presence of the jury and request counsel to pose the questions to the witness.'" *Kemble*, 291 Kan. at 115. In questioning a witness or witnesses, the judge must ensure the jury does not get the impression the judge favors one party over another. 291 Kan. at 115.

It is with this framework in mind that we review Fry's claim of judicial error.

*Analysis*

Fry claims that the district court judge committed error by questioning certain witnesses. Such conduct is problematic because it can either lead the judge to act as an advocate for the prosecution, or give the appearance of the same, by drawing out certain facts from witnesses during trial. Fry specifically addresses the judge's questioning of the

KBI forensic expert; the judge's attempts to elicit T.M.'s middle name from the officer and Grandmother; and the judge's questioning of Mother.

Fry's first claim of error relates to the district court judge's questioning of the KBI forensic expert, who testified that she obtained partial DNA profiles from T.M.'s underwear. When the prosecutor ended direct examination, the judge asked, "On either of the partial of the underwear, were you able to determine whether or not the contributor was male?" The expert responded and informed the court that while one swab revealed a "mixture of three individuals" none offered a clear indication of a male contributor, but one other separate swab did indicate the presence of "male DNA" but "[the] results were insufficient for any comparisons." Fry argues this questioning by the judge informed the jury that there was male DNA on T.M.'s underwear—a fact about which the jury would have otherwise been unaware.

Fry also points to the district court judge's questioning of witnesses regarding the victim's middle name. After the prosecution ended its direct examination, the judge asked an investigating officer if he learned T.M.'s middle name—the officer responded that he had not. Later, during the State's direct examination of Grandmother, the judge jumped in and asked, "What is her middle name?" in reference to T.M. After Grandmother answered, the prosecutor said, "Judge, I had that question on my list." Fry notes that the State included T.M.'s middle initial on its charging document, so it needed to ensure it provided evidence of T.M.'s middle initial.

Fry's final complaint concerns the district court judge's actions in questioning Mother. Defense counsel cross-examined Mother about her willingness to testify against Fry. On redirect, the State asked if Mother was sure whether T.M. was telling the truth. Mother indicated that Aunt might have coached T.M. to make the allegations against Fry. Mother went so far as to say, "my sister is a liar." The State referenced T.M.'s trial testimony that Fry "'made me suck his D-I-C-K,'" asking if T.M. would have lied about it.

11

Mother said that T.M. would not have lied about it unless she was told to, whereupon the district court called counsel to the bench for an off-the-record discussion. The State then asked Mother whether anyone in law enforcement or with family services threatened her with losing her child. Mother stated that no one explicitly threatened it, but it was just something Mother felt.

After this redirect by the State ended, the district court judge then interjected with questions about Mother's reintegration plan to get more time with T.M. Fry contends that the district court wanted the jury to know that Mother would not lose her child if she failed to testify, but only if she failed to complete her reintegration plan. Fry's depiction of the exchange reads true. On cross-examination, defense counsel elicited from Mother that she was testifying against Fry only because she thought it would help her regain custody of T.M. On redirect, the State asked if Mother was making a choice between Fry and her daughter, and Mother said, "I am choosing my daughter. Yes." It was through the judge's questions alone that the jury learned of other factors that would affect reintegration. The judge, not the State, directly undermined defense counsel's questioning of Mother.

If this court reviewed the district court judge's interaction with each witness separately, we might not find error. For example, the KBI forensic expert's answer to the judge's questioning was not entirely conclusive. In fact, the revelation of male DNA allowed defense counsel to ask whether the DNA could have come from any male, which the forensic expert confirmed. Defense counsel also elicited testimony from the forensic expert that the DNA could have come from folding the clothes as they came from a dryer, or putting the clothes in a drawer, or helping the child dress. Further, there was testimony that T.M. remained dressed during any alleged incident, so evidence concerning her underwear was arguably extraneous.

12

Likewise, the district court judge's questioning of two witnesses regarding T.M.'s middle name could be construed as neutral since there was no dispute regarding the victim's identity in this case. Along these lines, the State argues the judge merely asked clarifying questions, which, according to the State, do not rise to the level of advocacy.

However, it is more difficult to justify the district court judge's questioning of Mother, even viewing it alone. But this court does not view the incidents in isolation because we are concerned with the entirety of the questioning—as well as the entire record—and the impact on the fairness of Fry's trial.

Therefore, while it may be arguable that each of these incursions into the State's examination of witnesses taken alone may not rise to the level of reversible error, this court's review looks at everything in tandem. Taken together, the district court judge's actions give us pause.

Significantly, a district court judge's questioning from the bench "must not result in the slightest suggestion of partiality or bias." See *Kahler*, 307 Kan. at 391. Here, we find that the district court judge's questioning of witnesses could have reasonably given the jury the perception of partiality in favor of the State. Further, we find that the evidence in this case cannot be described as so overwhelming that *the jury's perception of the evidence* elicited by the district court judge could not have tipped the balance one way or the other. See *State v. Simpson*, 29 Kan. App. 2d 862, 876-77, 32 P.3d 1226 (2001) (finding trial judge's questioning of an officer—which may have given an impression to the jury that he believed the defendant sold the officer drugs—"improperly lent [the court's] exalted weight to the State's theory" in an otherwise "extremely close," "balanced case").

The Kansas Supreme Court has provided clear instructions on how district court judges should handle the situation where they believe the jury requires clarification of

13

evidence or additional information from a witness. See *Kemble*, 291 Kan. at 115. Our Supreme Court has also made it clear that a district court judge must be careful to avoid giving the jury the impression that he or she is attempting to do the job of counsel in an adversarial, criminal proceeding. Rather, it is vital that district court judges promote the impartiality of our courts. This is especially important where a person is facing a serious deprivation of liberty.

Based on the foregoing reasoning, we find that the district court judge committed judicial comment error by questioning four of the State's witnesses, eliciting facts the jury otherwise would have not learned and possibly lending credibility or support to the State's case against Fry. For this reason—and based on the facts of this case—we find that the State has failed to establish—beyond a reasonable doubt—that the judicial comment error did not affect the outcome of the trial. *Blevins*, 313 Kan. at 423.

CONCLUSION

In summary, we find that the district court judge committed judicial comment error by questioning four prosecution witnesses in a manner which could have reasonably suggested partiality. Furthermore, we find that the State failed to establish the error did not affect the outcome at trial. As a result, we reverse Fry's conviction and we remand this case to the district court for a new trial. Finally, in light of our decision, it is not necessary for us to address the other claims of error asserted by Fry on appeal.

Reversed and remanded with directions.