No. 91,214

STATE OF KANSAS, *Appellee*, v. DURAYL VANN, *Appellant*.

(127 P.3d 307)

Opinion filed February 3, 2006.

*Michelle A. Davis*, assistant appellate defender, argued the cause, and *Durayl Vann*, appellant, was on a supplemental brief pro se.

*Renee S. Henry*, assistant district attorney, argued the cause, *Nick A. Tomasic*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Durayl Tyree Vann petitions this court for review of the Court of Appeals' decision affirming his convictions of one count each of attempted first-degree murder, attempted second-degree murder, unlawful possession of a firearm, and criminal damage to property, and three counts of aggravated assault in *State v. Vann*, No. 91,214, unpublished opinion filed May 27, 2005. He contends the district court's failure to consider his pretrial motions to discharge counsel and to proceed pro se and the court's failure to give a unanimity jury instruction constituted reversible error. We reverse and remand based upon the trial court's failure to consider defendant's motion to proceed pro se. We also note that the district court, based upon the record, should have inquired as to

defendant's allegations that a conflict existed between himself and his attorney.

On the day in question, 16-year-old Dai-Mondd Jones (Jones) worked as a cashier in a party shop (convenience store) with an adjoining liquor store owned by Emzley Donnell, Jr., a.k.a. Beaver (Donnell). That morning, a young man ran into the party shop and got behind the counter, saying, "[D]on't let them get my money," "They going to kill me," and "[T]hey going to rob me." The defendant Durayl Tyree Vann and another individual had chased the young man into the store and pounded on the counter. Jones told the defendant not to beat on the glass, and the defendant asked Jones if he wanted to fight. Donnell came over and let the young man leave through the liquor store. Donnell grabbed the defendant when he started beating on the counter again, pushed him out of the store, and told him not to come back. Donnell testified that the defendant was saying things like, "I kill you," "I blow you," and "I beat you." After Donnell threw the defendant out, the defendant saw the young man he had been chasing and ran after him.

The defendant returned to the party shop and broke a glass window with his fist. Donnell ran after him but the defendant got away. The defendant returned three or four more times that morning, and Donnell repeatedly chased him off. Donnell called the police and went home to retrieve his gun, and upon his return he saw the defendant coming toward his store with a baseball bat. Donnell chased the defendant and shot at him, and the defendant ran off. The police arrived at that point and took a report.

Donnell left the store around 5 p.m. Around 7:00 or 7:30 p.m., Norris Brownlee came into the liquor store and told liquor store employee Rick Collins that the defendant had talked about coming to the store and robbing and shooting the owner (Donnell) earlier that evening. Collins called Donnell and told him about the threat, and Donnell arrived 10-15 minutes later.

About 8 p.m. that evening, the defendant came into the party shop with his head down and holding a shotgun. The defendant cocked the shotgun, pointed it through the glass toward Jones, and said, "[A]ll ya'll going to die." Jones ran and dove through the door to the liquor store yelling, "Beaver, get down, he got a gun." As he

went through the door, Jones heard a shot fired, and he heard additional shots, although he could not say how many.

Upon hearing Jones hollering, Donnell, who was in the liquor store, grabbed his gun and ran through the doorway into the party shop. He heard a gunshot and saw the defendant running toward the counter with a gun. Donnell shot back at the defendant and said, "[Y]our ass is mine now." The defendant hid in the store and Donnell tried to take another shot at him, but the gun jammed and did not fire.

Mae Seahorn, who was working as a cook at the convenience store, ran into the back storage room when she saw the defendant come into the store with the gun. She heard two or three shots, one of which shattered the window in front of the cook's counter inside of the store. Collins was in the liquor store when he heard the first shotgun blast. He ran back to the storage area, heard three more shots, and then heard a second shotgun blast.

Lamont and Tonia Holmes were customers in the store at the time of the shootings. Tonia testified that she heard a voice say, "[W]hat's up now, nigger, what you going to die." She heard what sounded like an explosion, and she and Lamont got down on the ground. She heard a gun cock and then she heard another shot. She heard Donnell's voice coming from the other side of the store, and then she heard and felt a gun discharge by her leg as someone was leaving the store. Lamont echoed these same facts at trial.

The defendant was taken to the hospital by a family friend who lived near the store. He testified that the defendant had a gunshot wound to the leg. At the hospital, a police officer observed that the defendant had a large chunk missing from the shin of his right leg and his large toe was almost blown off.

The police investigation of the crime scene suggested that three shots had been fired, one from the handgun, which went through a post into the wall, and two from the shotgun, based on two shotgun shell casings, the broken glass, and the hole in the floor. There was a shotgun blast in the tile floor with blood around it, and blood that trailed on the floor. The DNA profile of the blood samples taken from the store matched the defendant's DNA.

After his conviction by a jury, the defendant's motion for new trial was denied, and he was sentenced to a controlling term of 312 months' imprisonment. The Court of Appeals affirmed his convictions on appeal in *State v. Vann*, No. 91,214, unpublished opinion filed May 27, 2005. This court granted the defendant's petition for review, which claimed that the district court erred in failing to consider his pro se motions to discharge counsel and to proceed pro se and in failing to give a unanimity jury instruction.

*District Court's Failure to Address Pro Se Motions*

The court appointed David Reed to represent the defendant on August 22, 2002. On October 22, 2002, the defendant filed a pro se "Motion for Relief of Court Appointed Counsel" arguing: (1) that the attorney/client relationship had "deteriated" [*sic*] and "gotten off to a wrong start," leaving the defendant with no confidence in his counsel's representation; (2) that counsel had breached the duty and obligation owed to the defendant by failing to protect his interests and defend him with the required professional skill and energy needed; (3) that a conflict of interest existed between the defendant and counsel based on the reasons listed and his letters to counsel which were never answered; and (4) that his constitutional rights to effective assistance of counsel would be violated if Reed continued as his counsel. The defendant did not serve Reed with a copy of this motion, nor was it addressed at the preliminary hearing on October 30, 2002.

On October 31, 2002, the defendant sent a letter to the clerk of the district court inquiring about his motion for relief of court-appointed counsel that he had filed "which has not been put to use." The letter stated that he "would like to fire" Reed and wanted Reed "terminated off of my case," summarized the claims set forth in his motion, and asked why he had not received a new attorney. A handwritten note at the bottom of the letter stated: "We filed your motion for new attorney on 10-22. You were in court yesterday, but we don't know if you discussed this or not. Only the Judge can make a change."

On November 6, 2002, the defendant filed three pro se motions to suppress, a motion for discovery, a motion for writ of habeas

corpus, and a motion to proceed pro se. The latter motion asked the court that he be able "to proceed as pro se and retain the attorney as consultant in an advisery [*sic*] capacity."

Wyandotte County District Judge J. Dexter Burdette sent Reed a letter dated November 7, 2002, which provided in relevant part:

"Attached please find correspondence forwarded to this office from your client, Mr. Vann. Would you please contact your client and explain to him that this Court does not entertain motions filed by defendants when they have an attorney. These motions should be filed by their attorney when deemed appropriate.

"After consulting with your client, if it is determined that you desire a hearing on this matter, contact my office and one will be scheduled."

The only attachment to this letter in the record is the defendant's October 31, 2002, letter to the clerk of the district court, which identified defendant's contentions regarding his conflict with counsel and his desire that a new attorney be appointed.

On the first day of trial, the prosecutor reminded the court that the defendant had filed pretrial motions. The trial judge responded that he ordinarily did not hear pro se motions when the defendant has representation; however, if the defendant wanted to talk them over with his attorney and have him bring them before the court, he would hear them. The court asked the prosecutor what the motions were, and he replied: "They're all bare bones motions to suppress any blood evidence, witness testimony, I mean, things that don't make any sense to the State, Your Honor." The judge responded: "I see them in the file and I see that Judge Burdette wrote him concerning them, . . . and that Mr. Reed has in fact filed similar motions in this case, which I assume have been heard. Have your motions all been heard for discovery?" Reed answered, "Yes, Your Honor," and stated that he did not have any more motions. The defendant did not say anything to the court regarding his motions at this time.

The defendant first raised the issue of his pro se motions for new counsel before the court at the motion for new trial hearing:

"THE DEFENDANT: . . . Furthermore, Your Honor, I would like to address to the Court about a motion that was filed October 22 in which this motion was filed for relief of court-appointed counsel, Mr. David Reed. I can get this out of here for you. Here it is, Your Honor. But for the last four months, Your Honor,

I have been trying to get this man dismissed from this case due to the irreconcilable differences that cannot be compromised, due to the fact of the conflict of interest. I believe that this man did not represent me with the proper representation when it came to trial. I don't know how this goes, Your Honor, but this motion was filed and yet it was not entertained. And I can't go to trial.

"THE COURT: We took up pretrial motions the day of trial. If you had a problem you should have brought it up at that time.

"THE DEFENDANT: I was informed that it was not in my best interests to do that.

"THE COURT: Well, but the motion is filed. After we go to sentencing, Mr. Vann, I'll appoint the appellate public defender to represent you on your appeal. And you won't have Mr. Reed anymore. Mr. Reed is perfectly competent to handle your sentencing.

"THE DEFENDANT: There's no way I could get a different attorney?

"THE COURT: I told you when the—after sentencing I will appoint the appellate public defender to handle your appeal. Mr. Reed is competent to handle your sentencing."

At sentencing, the defendant again brought up the issue of his pro se motion for new counsel:

"Then I have a motion that was filed about the ineffective assistance of counsel which was filed October 22. I also have letters here to Kathleen Collins complaining about it. Then she told me to bring it up in the court. And I brought it up to Judge Burdette. He said he wouldn't entertain the motions unless it was filed by my attorney.

"And I was about to fire my attorney so I was forced to go to trial due to—you know, we have a conflict of interest between me and my attorney, which I feel, hey, that's a violation right there. How can I have a fair trial if I have somebody not defending me to the best of their ability, or representing me to the best of their ability?"

The district court ignored defendant's questions and proceeded to sentencing.

Before the Court of Appeals, the defendant argued the district court erred in refusing to consider his motions to discharge counsel and to allow him to proceed pro se. The panel rejected this argument, reasoning:

"Vann's claim of a conflict of interests was contained in a handwritten pro se motion filed before his preliminary hearing. He had multiple opportunities thereafter to bring it to the court's attention but failed to do so. The trial court's duty to inquire into a claimed conflict of interests arises only when the court is advised of the claim. When the issue of pro se motions was first raised immediately before

trial, Vann stood mute when the State characterized the motions as simply repetitive discovery motions that had already been ruled upon. His posttrial assertion of the motion was simply too late. A defendant cannot lay in the weeds on such a significant issue that should be addressed well before trial and wait until after an unsuccessful trial outcome to raise it for the first time.

"Similarly, Vann's posttrial assertion of his motion to proceed pro se was untimely. As noted in *State v. Hollins*, 9 Kan. App. 2d 487, 489, 681 P.2d 687 (1984): 'A defendant can assert the right to self-representation only by waiving the right to counsel, and, unlike the right to counsel, the right to self-representation can be waived by mere failure to assert it.' Here, Vann apparently considered his motion to proceed pro se as his 'Get Out of Jail Free' card. He filed it, failed to serve it on his counsel, failed to seek a hearing, stood silent when the court inquired about unresolved pretrial motions, and waited until after conviction to bring it to the court's attention." *Vann*, slip op. at 7-8.

## 1. Motion to Discharge Counsel

The defendant first argues the district court erred in refusing to consider his pro se motion for discharge of court-appointed counsel.

"It is the task of the district judge to insure that a defendant's Sixth Amendment right to counsel is honored. [Citation omitted.]" *State v. Taylor*, 266 Kan. 967, 975, 975 P.2d 1196 (1999). "Where a trial court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further." 266 Kan. at 979 (citing *Wood v. Georgia*, 450 U.S. 261, 272, 67 L. Ed. 2d 220, 101 S. Ct. 1097 [1981]). Likewise, "where the trial court is advised of the possibility of a conflict by either the defendant or the State, the court is required to initiate an inquiry to insure that the defendant's Sixth Amendment right to counsel is not violated." *State v. Jenkins*, 257 Kan. 1074, 1083-84, 898 P.2d 1121 (1995). "A trial court abuses its discretion if it fails to inquire further after becoming aware of a potential conflict between an attorney and client." *State v. Carver*, 32 Kan. App. 2d 1070, 1078, 95 P.3d 104 (2004) (citing *Taylor*, 266 Kan. at 978).

The defendant argues the district court failed to safeguard his Sixth Amendment right to counsel because it was aware of his allegations of a conflict of interest but failed to conduct any inquiry or investigation. He contends the trial court's refusal to consider

his pro se motion because he was represented by counsel was inappropriate because it shifted the decision about whether to pursue the motion to defense counsel. The State responds that the trial court was not made aware of the pro se motion for discharge of court-appointed counsel and motion to proceed pro se, and the defendant waived these motions by failing to bring them to the court's attention and by acquiescing in his attorney's actions. It relies upon *State v. Boyd*, 27 Kan. App. 2d 956, 965, 9 P.3d 1273, *rev. denied* 270 Kan. 900 (2000), in support of its argument.

In *Boyd*, the defendant filed a pretrial pro se motion to dismiss counsel. The defendant attended the pretrial motions hearing with counsel, but his pro se motion was not discussed. He argued on appeal that the trial court's failure to dispose of the motion violated his Sixth Amendment right to counsel, but the panel rejected this argument, reasoning:

"There is nothing in the record to indicate that Boyd ever objected to the appearance of his trial counsel. Boyd appeared with his attorney at the motions hearing, the jury trial, the motion for new trial, and at sentencing. He had ample opportunity to object to the presence of his attorney. Also, an issue not presented to the trial court, as is the case here, will not be considered for the first time on appeal." 27 Kan. App. 2d at 965.

This case is distinguishable from *Boyd* in that the defendant raised the issue of his pro se motion for new counsel on repeated occasions before the district court. While the defendant failed to raise his pro se motions at the preliminary hearing or at the motions hearing on the first day of trial, the defendant did send the clerk of the district court a letter requesting that his motion for discharge of court-appointed counsel be granted the day after the preliminary hearing. Judge Burdette's knowledge of this motion is evidenced by his letter to defense counsel concerning the defendant's pro se motions and letter to the clerk seeking to discharge his attorney.

At the pretrial motions hearing, Judge Duncan acknowledged that he had seen the pro se motions in the file and Judge Burdette's letter, but he focused only on the motions for discovery and did not inquire about the motion or the letter's allegations of a conflict of interest between the defendant and defense counsel. The judge did not address the defendant or inquire about his motion to dis-

charge counsel but rather left it up to defense counsel to state whether there were any additional motions. Following trial, the defendant again raised the issue of a conflict of interest between defense counsel and himself at both the motion for new trial and sentencing hearings, and he explained that he had been advised not to bring up the motion at the pretrial motion hearing. Despite these repeated complaints, the district court failed to inquire or conduct any further inquiry, simply telling the defendant that he would receive new appellate counsel following sentencing. As such, *Boyd* provides little guidance on this issue.

Rather, this case is more analogous to *State v. Simpson*, 29 Kan. App. 2d 862, 32 P.3d 1226 (2001). In *Simpson*, Simpson informed the court that he was having "disagreements on certain issues" with his attorney. 29 Kan. App. 2d at 865. Although the trial court allowed Simpson to explain why he believed a certain piece of evidence should have been admitted, the trial court did not ask Simpson whether the evidentiary issue was the extent of his problem. Citing *Taylor*, the panel found the trial court did not give Simpson an adequate opportunity to explain the perceived problems with his attorney. It found the trial court reasonably should have known that Simpson's conflict with defense counsel had not been resolved when Simpson announced that he had a question. Rather than addressing Simpson, the trial court swiftly referred him to defense counsel. The trial court's failure to more fully inquire into Simpson's alleged problems with defense counsel was an abuse of discretion. 29 Kan. App. 2d at 871-72. *Cf. State v. Richardson*, 256 Kan. 69, 82, 883 P.2d 1107 (1994) (inquiry into conflict of interest was not insufficient where the trial court asked the defendant to explain why he was unsatisfied with his counsel and afforded the defendant and counsel time to try to come to an understanding so the attorney-client relationship could be maintained).

In this case, the Court of Appeals' decision rests on the fact that the defendant did not orally assert his motion prior to trial and that his posttrial assertion of the motion "was simply too late." *Vann*, slip op. at 8. However, the record demonstrates that the district court was aware of the defendant's pretrial pro se motion to discharge his attorney and the defendant's corresponding letter seek-

ing to fire his attorney prior to trial, despite the defendant's failure to bring the motion to the court's attention prior to trial; yet, the court conducted no inquiry into the matter. Likewise, while the timing of the defendant's decision to raise the issue again at the motion for new trial and sentencing hearings may not have been ideal, this court has specifically rejected a test utilized by the Court of Appeals in previous cases which considers as a factor the "timeliness of the motion" in determining whether the trial court abused it discretion in failing to discharge a court-appointed attorney at the request of the defendant. See *State v. Jasper*, 269 Kan. 649, 653-54, 8 P.3d 708 (2000). Moreover, the defendant specifically asked for a new attorney at sentencing, but the trial judge brushed this request aside with no inquiry by telling the defendant that he would appoint different appellate counsel following sentencing.

In this case, the district court's knowledge of the defendant's pro se motion to discharge his attorney alleging a conflict of interest, followed by the defendant's corresponding letter referring to the motion, the defendant's subsequent motion seeking to proceed pro se, and the defendant's posttrial assertions of a conflict of interest, coupled with the court's failure to conduct any inquiry whatsoever, constituted an abuse of discretion.

Ordinarily, the appropriate remedy, in the absence of a suitable record on appeal concerning the alleged conflict of interest, is to remand to the trial court for a determination of whether the defendant can "establish that the conflict of interest adversely affected his counsel's performance." *State v. Gleason*, 277 Kan. 624, 653-54, 88 P.3d 218 (2004) (quoting *Mickens v. Taylor*, 535 U.S. 162, 174, 152 L. Ed. 2d 291, 122 S. Ct. 1237 [2002]). However, our conclusion in the next issue requires that we reverse the defendant's convictions and remand for new trial.

## 2. Motion to Proceed Pro Se

The defendant next argues the trial court's refusal to address his motion to proceed pro se with an attorney as a consultant in an advisory capacity filed prior to trial was a denial of his right to self-representation.

In *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), the United States Supreme Court held that the Sixth Amendment, as made applicable to the states by the Fourteenth Amendment, guarantees that a defendant in a state criminal trial has an independent constitutional right to self-representation. *State v. Collins*, 257 Kan. 408, 411, 893 P.2d 217 (1995). Additionally, the *Faretta* Court also noted that a State may appoint "standby counsel," even over the defendant's objection, to assist the pro se defendant in his or her defense. 422 U.S. at 834, n.46.

"A criminal defendant who before trial clearly and unequivocally expresses a wish to proceed pro se has the right to self-representation after a knowing and intelligent waiver of the right to counsel. A knowing and intelligent waiver requires that the defendant be informed on the record of the dangers and disadvantages of self-representation. The choice is to be made ' "with eyes open." ' [Citation omitted.]" *State v. Graham*, 273 Kan. 844, 850, 46 P.3d 1117 (2002).

"Because the right to proceed pro se is at odds with the right to be represented by counsel, '[t]he courts must indulge "every reasonable presumption against waiver" of the right to counsel, and will "not presume acquiescence in the loss of fundamental rights [*i.e.*, the right to counsel]." ' [Citation omitted.] '[U]nlike the right to counsel, the right to self-representation can be waived by mere failure to assert it.' [Citation omitted.]" *State v. Lowe*, 18 Kan. App. 2d 72, 74-75, 847 P.2d 1334 (1993).

"Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 79 L. Ed. 2d 122, 104 S. Ct. 944 (1984); accord *Lowe*, 18 Kan. App. 2d at 74.

In addition to *Faretta* and *McKaskle*, the defendant relies upon *Lowe* in support of his position. Lowe moved for self-representation on the day of trial. The trial court responded to the motion by inadvertently misstating the law and telling Lowe that he could proceed pro se only if the court found that Lowe would not benefit from a lawyer in the case. The court warned Lowe of the pitfalls of self-representation, encouraged him to retain his attorney, but failed to ask him if he still wanted to proceed pro se. As in this case, the State argued on appeal that Lowe waived his right to

represent himself by failing to reassert his right to self-representation and by allowing counsel to continue to represent him when the proceedings continued. The Court of Appeals found that Lowe did not invite counsel's subsequent participation and, at most, he allowed counsel to continue without reasserting his request to represent himself. The court concluded that when the trial court's statements and actions were viewed in toto, a danger existed that Lowe understood not only that his request had been denied, but also that there was no possibility the court would allow him to represent himself. 18 Kan. App. 2d at 76.

In this case, we thus consider whether the defendant clearly and unequivocally asserted his right to self-representation prior to trial. The State maintained and the Court of Appeals agreed in this case that the defendant's failure to serve the motion on counsel, request a hearing, or to raise the issue at the pretrial motions hearing was a waiver of the right to self-representation. We do not agree.

The defendant's motion "to proceed pro se and retain the attorney as consultant in an advisery [sic] capacity" was a clear and unequivocal assertion of the right to proceed pro se prior to trial. While we acknowledge that the defendant had filed other motions requesting the appointment of a new attorney, this did not change the fact that the defendant expressed a desire to proceed pro se. In fact, the existence of these other motions was a greater reason for the court to conduct a further inquiry into the defendant's position.

Once the defendant asserted his constitutional right to self-representation by pretrial motion, his counsel was advised of the existence of the defendant's pro se motions by letter from the district court, and the defendant was told by the court that it would not consider motions raised by the defendant himself. The defendant subsequently explained to the court that counsel had advised him against raising his pro se motions. Based on these facts, as in Lowe, a possibility certainly existed at the pretrial motions hearing that the defendant allowed defense counsel to continue representing him because he felt that he had no other choice.

Moreover, the effect of the Court of Appeals' opinion would be that a defendant would bear the burden of continually reasserting

his or her right to self-representation or it is waived. *Lowe* counsels that where the defendant allows defense counsel to continue representing him without reasserting his right to self-representation, it does not constitute a waiver of that right. As the district court failed to consider the defendant's pretrial assertion of his right to self-representation, the conviction must be reversed and the case remanded for new trial. See *Lowe*, 18 Kan. App. 2d at 79.

*Multiple Acts Unanimity Jury Instruction*

In the interest of judicial economy, we elect to address the defendant's remaining argument concerning the district court's failure to give a multiple acts unanimity jury instruction as this issue is likely to arise again on remand.

The defendant was charged with attempted first-degree murder of Donnell. During closing argument, the prosecutor described the acts it was relying upon for this charge:

"But Mr. Donnell says when he fires that first shot he's still over in that area and it fires that way. But that first shot is a—is at Dai-Mondd Jones and that's what the evidence shows. Whether it was a good shot by the defendant or not that's where it was intended. And it was also intended at Mr. Donnell who he's summoning to come from the liquor store side. And that's what the first shot is from. That's why there's two Counts, one on Dai-Mondd, and one on Emzley Donnell.

"And the State would submit to you that the evidence shows that obviously he didn't complete the crime. Why didn't he complete the crime? Because Mr. Donnell had a revolver and the State would submit to you after he fired the first shot he ran around to the back counter and you'll see it. He pumped it out to get the next round in. He now has heard Mr. Donnell shoot at him is what the State would submit to you. And whether he's nervous, excited or whatever, the State would submit to you he shoots himself in the leg and the foot, what Officer Ladish testified that he saw at the hospital.

. . . .

". . . And he shot himself there because he didn't know Mr. Donnell was going to have a gun. He got excited and nervous and boom, shot himself in the leg. Then he realizes that he's hurt and he has to get out of there. And you know he pumped out the empty shell and the shotgun wad is gone there and that goes to show the attempt. It was just more than mere preparation or mere thoughts."

The defendant argues for the first time on appeal that the district court should have given a unanimity instruction because multiple acts could have constituted the basis for finding him guilty of the

attempted murder of Donnell. Specifically, he contends that the jury could have found him guilty based upon either the defendant's first shot in the direction of the liquor store or the (overt) act of pumping out the shell from the shotgun right before the second shot, an accidental discharge, was fired.

" ' "In multiple acts cases, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." [Citations omitted.]' " *State v. Stevens*, 278 Kan. 441, 452, 101 P.3d 1190 (2004).

In *State v. Hill*, 271 Kan. 929, 26 P.3d 1267 (2001), the defendant was charged with a single count of rape but evidence was presented that the defendant digitally penetrated the victim in the bathroom, pursued her into the kitchen, and digitally penetrated her again. The Kansas Supreme Court adopted a two-step harmless error analysis to be applied when it is contended that a unanimity instruction should have been given:

"In applying a two-step harmless error analysis, the first step is to decide whether there is a possibility of jury confusion from the record or if evidence showed either legally or factually separate incidents. Incidents are legally separate when the defendant presents different defenses to separate sets of facts or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents. Incidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by 'a fresh impulse.' When jury confusion is not shown under the first step, the second step is to determine if the error was harmless beyond a reasonable doubt with respect to all acts." 271 Kan. 929, Syl. ¶ 3.

Under the facts of *Hill*, the court concluded that the two acts of penetration were separate incidents of rape. However, the court found there was no possibility of jury confusion where no extrinsic evidence to support the charges existed and the sole issue was the credibility of the victim's account of the penetrations. As the defendant presented only a general denial of participation in any wrongful conduct, which was rejected by the jury, the court found

there was no rational basis by which the jury could have convicted the defendant of one rape and not the other. 271 Kan. at 940.

However, more recently in *State v. Kesselring*, 279 Kan. 671, 112 P.3d 175 (2005), this court identified a threshold analysis to a multiple acts analysis which incorporates part of the *Hill* test. In *Kesselring*, the defendant argued that any one of multiple acts could have constituted the charge of aggravated kidnapping. Citing *State v. Staggs*, 27 Kan. App. 2d 865, 867, 9 P.3d 601, *rev. denied* 270 Kan. 903 (2000), we found that "[t]he threshold question in a multiple acts analysis is whether the defendant's conduct is part of one act or represents multiple acts which are separate and distinct from each other." 279 Kan. at 682. In *Staggs*, the defendant argued he was entitled to a unanimity instruction on his aggravated battery charge where the evidence showed that he both punched and kicked the victim during a fight. The *Staggs* court held:

"[T]he evidence here supports only a brief time frame in which the aggravated battery occurred. Once defendant initiated the altercation, no break in the action of any length occurred, and the confrontation continued until defendant broke the victim's cheekbone. Simply put, the evidence established a continuous incident that simply cannot be factually separated. No 'multiple acts' instruction was necessary." 27 Kan. App. 2d at 868.

In applying the *Staggs* analysis, the *Kesselring* court quoted from the first step of the *Hill* analysis regarding factually separate incidents, stating " '[i]ncidents are factually separate when independent criminal acts have occurred at different times or when a late criminal act is motivated by "a fresh impulse," ' " reasoning that "[a]lthough we have previously used this test as part of the harmless error analysis in *Hill*, it is also an appropriate test for determining the threshold question of whether multiple acts are involved." 279 Kan. at 683. The court concluded that the kidnapping was a continuous incident that could not be factually separated despite the fact that the event transpired over several hours, the victim was moved from one location to another, and he was momentarily free during an attempted escape. 279 Kan. at 683.

In this case, while not mentioning *Staggs* or *Kesselring*, the Court of Appeals panel essentially performed this threshold anal-

ysis by applying only the first step of *Hill* in concluding the failure to give a multiple acts instruction was not erroneous:

"Vann's argument is predicated upon there being two factually and legally separate incidents. There were not. First, the incidents are not legally separate. The court's instructions did not shift the legal theory from a single incident to two separate incidents. Vann did not present one defense to the first shot and another to the reloading in anticipation of the second shot. His argument to the jury relating to this count was directed at the issue of intent and applied equally to the first shot and the reloading:

'Count 1 charges my client, Durayl Vann, of the attempted murder in the first degree of Emzley Donnell. But I ask you, who was trying to kill whom? . . .

'Mr. Donnell decides to take matters in his own hands. He runs home and he gets a gun. And he comes back. He sees the defendant walking down the street across the street and what does he do? He shoots. He fires. My client takes off running. . . .

'And with regard to this issue of intent upon Mr. Donnell, let's take a look a closer look at that. The testimony is that the individual who came into the store with the shotgun fired, then Dai-Mondd Jones, the clerk, runs in back. Mr. Donnell who is already there comes out, basically loaded for bear. He says, your ass is mine. Who is trying to kill whom? I think that after you carefully consider that evidence that you'll find that there surely is a reasonable doubt as to whether my client, Mr. Vann, intended to do anything to Mr. Donnell.'

"Nor were the two shots factually separate. It appears from the descriptions of the witnesses that the entire incident took no more than a matter of minutes. Vann announced when he arrived that evening that everyone was going to die. The first shot and the reloading were part of the single transaction to carry out that expressed design. The reloading after the initial shot was not instigated by a 'fresh impulse,' but by the initial impulse that brought him to the party shop that night. Under these circumstances, there were no legally or factually separate incidents. The failure to give a unanimity instruction was neither erroneous nor, under the more stringent standard at play here, clear error." *Vann*, slip op. at 11-12.

Thus, in this case, our first inquiry is whether this is truly a multiple acts case which requires a unanimity instruction, *i.e.*, "whether the defendant's conduct is part of one act or represents multiple acts which are separate and distinct from each other." *Kesselring*, 279 Kan. App. 2d 671, Syl. ¶ 5. *Kesselring* counsels that we look to a portion of the first step of the *Hill* analysis to make a determination whether the incidents are factually separate. As in *Staggs* and *Kesselring*, the defendant's actions in shooting the first shot and pumping the shotgun to reload are part of a continuous

incident that occurred within only a couple of minutes. They were both performed with the express design announced by the defendant to kill everyone in the party shop. The fact that the defendant encountered return gunfire in resistance did not spark a "fresh impulse" for him to reload the shotgun; rather, the reloading was necessary to carry out his plan to kill everyone.

This case is thus distinguishable from *Hill*, where the court found two separate incidents of rape occurring within a short period of time, as the defendant in this case could not be charged with two counts of attempted murder of Donnell based on his actions in firing the first shot and reloading the shotgun. Compare *State v. Perry*, 266 Kan. 224, 229, 968 P.2d 674 (1998) (convictions of attempted murder and aggravated battery were multiplicitous where the victim was beaten and shot because the underlying acts of violence occurred simultaneously or "at approximately the same time and place"), with *State v. Fulton*, 28 Kan. App. 2d 815, 23 P.3d 167, *rev. denied* 271 Kan. 1039 (2001) (one continuous incident rather than multiple acts where the defendant cut the victim on the face and then cut him on his chest because it would have been multiplicitous to charge each cutting separately).

We conclude that this case does not involve separate factual incidents; it is not a multiple acts case. Thus, a unanimity instruction was not required. The Court of Appeals' decision on this issue is affirmed.

Affirmed in part, reversed in part, and remanded for further proceedings.