IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,253

STATE OF KANSAS,
*Appellee*,

v.

QUARTEZ BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

If a district court makes an appropriate inquiry into a motion to appoint new counsel, it is the defendant's burden to show the district court abused its discretion in denying the motion. A district court abuses its discretion if its action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

2.

The right to effective counsel for criminal defendants is deeply rooted in American jurisprudence and embedded in both the Kansas and United States Constitutions.

3.

Sometimes a defendant prefers different counsel from the one appointed. But the Sixth Amendment to the United States Constitution does not provide an indigent defendant a right to compel the district court to appoint the counsel of his or her choice.

1

Only if the defendant demonstrates justifiable dissatisfaction with his or her current counsel does the Sixth Amendment require a court to appoint new counsel.

4.

Justifiable dissatisfaction can be shown through a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication.

5.

Disagreements and lack of communication between a defendant and counsel will not always rise to the level of justifiable dissatisfaction. As long as the district court has a reasonable basis for believing the attorney-client relationship has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.

6.

While criminal defendants are in charge of three decisions—(1) what plea to enter; (2) whether to waive the right to a jury trial; and (3) whether to testify on their own behalf—strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. And, even for those strategic and tactical decisions, "consultation" does not mean the attorney must ask a defendant's permission—it merely implies a general discussion between counsel and the client.

7.

Should a substantial break in communication between criminal defense counsel and client occur, if the district court restores communication or determines communication has otherwise been restored, it may be unnecessary to appoint substitute counsel.

Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed October 28, 2016. Affirmed.

*Korey A. Kaul,* of Kansas Appellant Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney,* Assistant District Attorney, argued the cause, and *Julie A. Koon*, Assistant District Attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In this appeal, Quartez Brown again asks us to consider whether he should have been given new counsel when he filed a motion for substitute counsel before his trial on charges of felony murder, aggravated burglary, and aggravated assault. He previously persuaded us, in a 2014 appeal, that the district court abused its discretion in declining to inquire into Brown's pretrial motion for substitute counsel. *State v. Brown*, 300 Kan. 565, 331 P.3d 797 (2014). We remanded for an evidentiary hearing, after which the district court concluded Brown had not established a conflict or justifiable dissatisfaction with his attorney. Although Brown continues to argue there was a complete breakdown in communication with his attorney, we reject his arguments and hold the district court did not abuse its discretion in concluding there had not been a complete breakdown in communication between Brown and his counsel before trial. Accordingly, we will affirm.

3

FACTUAL AND PROCEDURAL BACKGROUND

In April 2010, Brown and his cousin, both armed, entered an apartment belonging to Otis Bolden. They encountered Ashley Green and, pointing their guns at her, asked where Bolden could be found. Green saw Brown and his cousin walk into Bolden's bedroom and then heard shots. Although Bolden was able to exit the apartment through a window, he later died from multiple gunshot wounds.

After a trial, a jury convicted Brown of first-degree felony murder, the alternative charge of intentional second-degree murder, aggravated burglary, and aggravated assault. Brown appealed. We rejected three of his arguments, concluding sufficient evidence supported his aggravated burglary, felony murder, and aggravated assault convictions; reversible error did not occur when the district court failed to give lesser included offense instructions on voluntary manslaughter, reckless second-degree murder, and involuntary manslaughter; and the district court did not violate Brown's rights under the Sixth and Fourteenth Amendments to the United States Constitution based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by considering his prior convictions at sentencing. *Brown*, 300 Kan. 565.

Nevertheless, based on two remaining issues we reversed and "remand[ed] to the district court with instructions to: (1) Conduct a hearing on [Brown's] claim of attorney dissatisfaction, at which the defendant is to be represented by conflict-free counsel; and (2) correct the journal entry of judgment to reflect that second-degree intentional murder is a severity level 1 offense." 300 Kan. at 590.

On remand, the district court corrected the journal entry, and Brown does not renew his appellate complaints on that issue. The district court also conducted the hearing regarding Brown's claim of attorney dissatisfaction and rejected Brown's arguments.

4

Brown appeals from that ruling, and we therefore will confine our discussion to the procedural history and facts relevant to Brown's pretrial motion for new counsel.

1. *Original Trial Proceedings and First Appeal*

In May 2010, approximately 9 months before trial, the district court appointed Steven Mank as Brown's attorney. In December 2010, approximately 2 months before trial, Brown filed a "Pro se petition for right of Habeas Corpus . . . due to unconstitutional conditions of confinement in violation of the 5th and 6th Amendment[s] of the Federal Constitution, Ineffective trial counsel." He requested new counsel due to Mank's "lack of performance and a complete breakdown of communication." According to Brown, Mank "refus[ed] to communicate '*at any level*' . . . concerning continuances, upcoming court hearings and defen[s]e preparations." Brown also stated he was in the process of filing a complaint with the Disciplinary Administrator's office; he asserted that once this complaint was filed Mank's continued representation would constitute a conflict of interest.

The district court scheduled a hearing on Brown's motion, set for January 21, 2011. A court order dated January 21, 2011, indicated Brown's motion was withdrawn, but indicated nothing else—no mention of who withdrew the motion, whether there was a hearing, or whether Brown participated. We now know that Mank asked the district court to withdraw Brown's motion.

Brown's case proceeded to trial, still with Mank as the assigned attorney. At the conclusion of the State's case, Mank stated he "[did] not intend to present any evidence. I have discussed with my client his right to testify, and I would ask that the Court put it on the record that it is his decision not to testify in this matter." The district court advised Brown he had the constitutional right to testify or not to testify, and "[t]hat decision rests

5

with you, not with your attorney. Obviously it should be done in consultation with your attorney, but ultimately the decision is up to you, regardless of what your attorney may recommend." Brown gave some conflicting responses but then stated he did not wish to testify.

As we previously noted, the jury found Brown guilty of first-degree felony murder, aggravated burglary, and aggravated assault. At the sentencing hearing, Brown revealed he had some concerns with the way Mank had handled his case. He referenced his December 2010 "motion to fire [his] attorney" and the scheduled January 2011 hearing. He said Mank came to see him and pleaded not to be fired, but Brown told Mank he did not wish to speak with him until the hearing on the motion. But, according to Brown, he was never called into the courtroom on his hearing date, and Mank later told him the judge had withdrawn his motion. "[S]o this whole time I've been trying to fire him." Brown explained he "never got a chance to hear it in front of a judge." The district court called Brown's comments "really something" and "outrageous" and countered them with something of a panegyric on Mank's behalf.

Mank, for his part, told the court that Brown had not mentioned any of these complaints when they had met the previous week to go over the presentence investigation report. Brown retorted that he had asked Mank "to take some of my things and to defend me," had asked Mank to say things Mank did not say, and had asked Mank to file motions that were not filed. The district court informed Brown that he was not a lawyer and that it was Mank who had the right to decide trial strategy; it then informed Brown that he would have a year after his appeal to file any ineffective assistance of counsel claims and proceeded with sentencing.

Brown was ultimately sentenced to 20 years to life imprisonment for the felony murder. The court ordered sentences of imprisonment for aggravated burglary and aggravated assault, with all sentences to run concurrently.

On Brown's first appeal, we ruled that his pretrial motion for new counsel "contained sufficient information to trigger the district court's duty to make further inquiry." 300 Kan. at 575. But the record did not reflect the district court "even attempted to fulfill that duty," and we described its approach to making a record as "cavalier." 300 Kan. at 571, 575. We, however, were not in the position to make factual findings about whether Mank had any conflict of interest in representing Brown or whether a conflict adversely affected Mank's performance. 300 Kan. at 578. Accordingly, we remanded with directions to appoint conflict-free counsel and conduct a hearing on Brown's motion. 300 Kan. at 590. We also directed the district court to "determine whether [Brown] has established justifiable dissatisfaction with his counsel and whether that conflict adversely affected the adequacy of the attorney's representation." 300 Kan. at 578.

2. *Proceedings on Remand*

On remand, the district court (presided over by a new judge) held an evidentiary hearing. During the hearing Brown and Mank testified about the entire scope of their relationship and trial preparation.

Brown testified that before he filed his December 2010 motion for substitute counsel he had met with Mank six to eight times, with each meeting lasting about 10 or 15 minutes. When asked about his impression of Mank, Brown replied, "Well, he's my attorney so I looked at it as him being my attorney. That's about it, but as far as getting along, just some things that I did disagree with Mr. Mank." The first time Mank visited him, they "discussed some of the things that may have happened and where we were

7

going, who were witnesses and what my involvement was and who was . . . putting me there at the scene of the crime."

When asked to elaborate about his disagreements with Mank, Brown stated:

"Like being able to put my input in as far as what people were saying and how I could be able to let them know—let the Court know that I—that it's not what it seems it was and being able to speak, being able to speak to the Court about that, you know, being able to compare notes, things like that."

Brown confirmed he and Mank talked about possible defenses and trial strategy, including how to combat witnesses that placed him at the crime scene. They also discussed discovery provided by the State. Brown "asked to see about discovery" and understood discovery policies, but he "wanted to compare the facts about certain things that the discovery might have in there that could help us out."

Brown was particularly concerned about a possible photo array. He never participated in one, he explained, and thus was not identified as a participant in the crime in that way. But he seems to have believed the police conducted a photo array with other people and did not provide this photo array during discovery. He asked Mank to file a discovery request for the photo array, but this motion never got filed. This prompted Brown to feel he did not have input in the trial strategy. He elaborated:

"I feel like Mr. Mank knew what he was going to do and what I said really didn't matter because I come with notes and I tried to make notes. He gave me the opportunity to give the notes, but at the same time I don't feel like he used my notes, went over them with me, so I didn't feel like I had really too much input in it."

Brown summarized that he and Mank were not going over strategies and were not able to agree on discovery requests, Mank did not use Brown's notes, and Mank was not

8

able to spend enough time on the case; Brown began to feel like they would not be able to put up a very good fight in the courtroom. And so, after Mank's fifth or sixth visit, Brown told Mank he would file a motion for substitute counsel and was considering filing an ethics complaint. Of note, Brown never actually filed a disciplinary complaint.

Brown remembered his motion was supposed to be heard on January 21, 2011, but he was not present for a hearing. He explained:

> "Whenever I didn't get to have the hearing, I thought just I was—but it was withdrawn. I didn't know any better at the time. I didn't know anything about the law. . . . So I thought I handled myself with this situation, and I just feel like I'm stuck from then on. I thought what was better to do was to just stick with a lawyer that has a law degree and knows the law then to go to court by myself and don't know anything about it."

After the motion was withdrawn, Brown did not think he and Mank discussed it. They did, however, talk about Brown testifying at trial. Brown told Mank he wanted to testify on his own behalf, but Mank advised him it would not be in his best interest because, according to Brown, "the [district attorney] would try to switch words around." But Brown felt that his testimony would have made a difference, and he wanted a chance to testify against the three people who were planning to tell the jury that he committed the crimes.

On cross-examination, Brown confirmed that he saw Mank after the December 2010 motion for substitute counsel and before the scheduled January 2011 hearing. They talked about the criminal case but not about Brown's motion. Mank also visited the night before the scheduled hearing, but Brown did not remember how long Mank stayed or what they spoke about. Brown flatly disagreed with the State's assertion that when Mank left after that visit there was an understanding that the representation would continue—he explained again that he went to trial with Mank because he "felt like [he] had to." Brown

9

reiterated, on redirect examination, that at the time he filed his December 2010 motion he felt there had been a complete breakdown in communication between himself and Mank; after the motion was not even heard by the district court he communicated with Mank because he felt stuck and did not think there were any other procedural options.

Mank testified he was an experienced criminal defense attorney and kept logs for the time he spent on cases, particularly for cases where, as with Brown, he had been appointed by the Board of Indigent Defense Services. The State presented an itemization of the time spent on Brown's case, as well as jail records indicating Mank made a couple of additional jail visits that were not reflected in his notes. Mank testified he visited Brown multiple times and decided to go talk to Brown after learning of his motion for substitute counsel. He was not alarmed by Brown's expressed intent to file an ethics complaint, as this was a normal thing for criminal defendants to assert on occasion.

According to Mank and his notes, he visited Brown 9 or 11 days before the January 2011 hearing and also the day before the hearing. He told Brown he was sorry to hear that Brown was not happy and told Brown he had a busy trial schedule and "had probably not devoted the time to him that I needed to"—but it was now Brown's turn and Mank would be more available than previously. Mank then asked Brown what he wanted him to do, and Brown "basically asked . . . whether or not [Mank] was going to give him [his] full attention." Mank assured Brown he would do so, and Brown said he was fine with Mank's continued representation.

Mank explained to the district court that he thought Brown's main concern was how many times Mank had visited the jail to talk and go over evidence. He did not recall any concerns Brown raised regarding a photo array, but he thought Brown might be remembering that one victim could not specifically identify who entered the house and fired shots. Mank did not think the victim's inability to identify Brown posed an issue

because Brown was placed at the scene because a codefendant took a deal and identified him, plus there was DNA evidence.

Mank stated he wrote Brown 30 letters and thought Brown "was pretty well-informed of what was going on, when it was going on." He also met with Brown's mother a number of times. Mank felt he was able to communicate effectively with Brown up to the filing of his motion. After his meeting with Brown the day before the scheduled January 2011 hearing on that motion, he wrote Brown a letter recounting their agreement and informing Brown he would continue to plan on representing him at the jury trial. This letter was admitted into evidence over Brown's objection that he did not recall receiving it. According to Mank, after this letter and up to trial, he heard no complaints from Brown regarding the lack of communication. And, again according to Mank, he was able to communicate effectively with Brown during trial and Brown was able to assist in his own defense. Mank met with Brown after trial and prior to sentencing, but he did not hear about any of Brown's concerns until they were brought up during the sentencing hearing.

On cross-examination, Mank stated Brown may have asked him to file a motion regarding the alleged photo array, "but based on the facts of this case, [he] probably would not have done that" and "would have explained to [Brown] why." Early in the trial preparation, Brown sent him a letter indicating he did not understand the trial process; Mank responded by sending a letter summarizing the case, what the evidence would be, his codefendant's agreement to testify against him, the physical evidence relating to the bullets found at the scene; and the source of the DNA evidence. Mank thought he had thoroughly answered Brown's questions in the letter and had also sent Brown the preliminary hearing transcript, the police reports, the trial date letter, and an additional police report—all told, at least five letters indicating the receipt of additional discovery.

Mank confirmed he and Brown had discussed Brown testifying at trial, but he did not remember whether this discussion occurred before Brown's December 2010 motion for substitute counsel. Mank was not able to testify about the particulars of that discussion because the district court concluded it was outside the scope of our remand instructions. The district court explained its understanding that it was supposed to consider Mank's representation on the date of the January 2011 hearing, when Brown's motion was withdrawn, and consider whether the situation as it existed at that point in time would have adversely affected Mank's representation or in fact did so.

After considering the above testimony (plus the testimony of the State's attorney in Brown's criminal case), the district court stated Brown would more likely than not have withdrawn his motion for new counsel at the January 2011 hearing—although the court noted it was certainly unusual that Brown was not present before the court when Mank withdrew that motion on his behalf. In any event, the district court announced it was taking a new look at the motion for new counsel and subsequent proceedings, focusing on the issues Brown raised in his motion and viewing the representation issue "primarily as it existed at the time the motion was withdrawn, maybe secondarily looking . . . at it with hindsight."

The district court found significant and regular communication between Brown and Mank via letters and in-person visits. Even if Brown had been able to raise all of his claims of dissatisfaction at the scheduled January 2011 hearing—even those not originally contained in his motion—the district court found he would not have come very close to demonstrating a complete breakdown in communication. After Brown's motion was withdrawn, communication between Mank and Brown continued and Brown could adequately and effectively help prepare Brown's defense.

The district court thus found the facts did not show communication had deteriorated to the point of an unfair presentation of a defense—even though Brown may have wanted more communication, there was adequate communication and also adequate time spent on the case. The district court also briefly touched on the photo array issue, which it described as a matter of strategy and not one for the district court to second-guess. There was also no reason to think Brown did not get all the discovery information that was fundamental and necessary to his communication with Mank. Further, it was clear Brown had input in the case: Testimony established the two had conversations on a regular basis. The district court ultimately ruled that, had it heard the hearing evidence at the time of Brown's motion, it would have denied Brown's motion for substitute counsel; there was nothing it had learned about Mank's representation afterwards that changed its view. Accordingly, Brown did not establish justifiable dissatisfaction with Mank and there was no conflict adversely affecting the adequacy of Mank's representation.

The district court entered a corresponding journal entry which stated:

"2. In his Motion for Substituted Counsel, Defendant alleged that he was filing a disciplinary action against Mr. Mank. No such action was filed, therefore there was no conflict of interest based on this claim;

"3. Defendant failed to show an irreconcilable disagreement with his appointed defense counsel . . . . Evidence was presented and the court finds that defendant's claim of attorney dissatisfaction was sufficiently resolved on the evening of January 20, 2011 which prompted the withdrawal of Defendant's Motion for Substituted Counsel on January 21, 2011;

"4. Defendant failed to show a complete breakdown in communication with his appointed defense counsel. The Court finds that Defendant was able to communicate with his attorney throughout the proceedings and participate in his defense;

"5. Because [Brown] did not present sufficient evidence to show 1) a conflict of interest, 2) an irreconcilable disagreement, or 3) a complete breakdown in

13

communications, he failed to [show] justifiable dissatisfaction with his appointed defense counsel and therefore his request for substituted counsel is without merit;

"6.    [Brown] had adequate representation throughout the proceedings and was not prejudiced by the withdrawal of his motion for substituted counsel."

ANALYSIS

The record shows that, on remand, the district court fully inquired into the alleged conflict between Mank and Brown. When, as here, the district court makes "an appropriate inquiry" into a motion to appoint new counsel and denies the motion, the defendant's burden on appeal is to show that the district court abused its discretion in denying the motion. *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013); see *State v. Bryant*, 285 Kan. 970, 986, 179 P.3d 1122 (2008); *State v. Sappington*, 285 Kan. 176, 196, 169 P.3d 1107 (2007); see also *State v. Vann*, 280 Kan. 782, Syl. ¶ 1, 127 P.3d 307 (2006) (explaining a district court necessarily abuses its discretion when it makes no inquiry into a conflict).

A district court abuses its discretion if its action is

"(1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Stovall*, 298 Kan. at 370.

Brown recognizes our abuse of discretion standard of review and contends that no reasonable person would have taken the view adopted by the district court in this case. See *Bryant*, 285 Kan. at 986. After examining the applicable law and considering the facts of this case, we reject his argument.

14

*Applicable Law*

The right to effective counsel for criminal defendants is deeply rooted in American jurisprudence and embedded in both the Kansas and United States Constitutions. *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014). See generally *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (to succeed in an ineffective assistance of counsel claim, a defendant must show that an attorney's performance was constitutionally deficient and that the errors were grave enough to deprive the defendant of a fair trial).

Sometimes a defendant prefers different counsel from the one appointed. But the Sixth Amendment to the United States Constitution does not provide an indigent defendant a right to "compel the district court to appoint the counsel of [his or her] choice." *State v. Burnett*, 300 Kan. 419, 449, 329 P.3d 1169 (2014); see *State v. Banks*, 216 Kan. 390, 393, 532 P.2d 1058 (1975) (asserting a defendant "does not have a right to be represented by a particular lawyer"). Only if the defendant demonstrates justifiable dissatisfaction with his or her current counsel does the Sixth Amendment require a court to appoint new counsel. *Banks*, 216 Kan. at 393-94.

Justifiable dissatisfaction can be shown through a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication. *Burnett*, 300 Kan. at 449; *Brown*, 300 Kan. at 575. Brown argues there was a complete breakdown of communication between himself and Mank, a state of affairs which established justifiable dissatisfaction with Mank and entitled Brown to different counsel.

But disagreements or a lack of communication between a defendant and counsel will not always rise to the level of justifiable dissatisfaction. See, *e.g.*, *Bryant*, 285 Kan.

15

at 991-93; *State v. McGee*, 280 Kan. 890, 897, 126 P.3d 1110 (2006); *cf. State v. Ferguson*, 254 Kan. 62, 71, 864 P.2d 693 (1993) ("[L]ack of cooperation or communication between defendant and trial counsel does not in and of itself constitute a violation of the Sixth Amendment right to counsel."). "'"[A]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."'" *Bryant*, 285 Kan. at 986-87 (quoting *Ferguson*, 254 Kan. at 70).

Thus, on remand, the district court had to determine whether Brown's relationship with Mank had deteriorated to the point that counsel can no longer provide effective aid toward a fair presentation of a defense—not whether Mank was willing to present the *exact* defense requested by Brown. See *Bryant*, 285 Kan. at 986-87. While criminal defendants are in charge of three decisions—(1) what plea to enter; (2) whether to waive the right to a jury trial; and (3) whether to testify on their own behalf—"'strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client.'" *Banks*, 216 Kan. at 395 (quoting *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 [1972]); see *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004). And, even for those strategic and tactical decisions, "consultation" does not mean the attorney must ask a defendant's permission—it merely "implies a general discussion between counsel and the client." *State v. Bafford*, 255 Kan. 888, 895, 879 P.2d 613 (1994); see *Rivera*, 277 Kan. at 117.

Finally, even should a substantial break in communication occur, if the district court "restore[s] communication between defense counsel and client" or determines that communication has otherwise been restored, it may be "unnecessary to appoint substitute counsel." *State v. Cromwell*, 253 Kan. 495, 504, 856 P.2d 1299 (1993).

*No Abuse of Discretion in Denying Brown's Dissatisfaction Claims*

Although Brown's original motion for substitute counsel could be fairly read to touch on all three areas of justifiable dissatisfaction—conflict of interest, irreconcilable disagreement, and complete breakdown in communication—on appeal he limits his argument to an alleged complete breakdown in communication. He does not, for example, challenge the district court's conclusion that a threat of a disciplinary complaint did not create a conflict of interest because no such complaint was ever filed. See *State v. Robertson*, 30 Kan. App. 2d 639, 642-49, 44 P.3d 1283 (2002). Nor does he presently allege any irreconcilable disagreements. He also makes no further mention of any particular issue with discovery requests. We will not disturb the district court's rulings which Brown has not continued to challenge. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) ("When a litigant fails to adequately brief an issue it is deemed abandoned.").

As to the arguments he does present, we conclude the district court did not abuse its discretion in determining Brown did not establish justifiable dissatisfaction with Mank. Brown testified he met with Mank at least six times prior to filing his motion, and he explained he just looked at Mank as being his attorney. He indicated there were "some things that I did disagree with Mr. Mank" but, when asked to elaborate, only explained that he did not feel Mank properly considered his input. These complaints amount to disagreements with Mank's trial strategy, the "'exclusive province of the lawyer.'" *Banks*, 216 Kan. at 395 (quoting *Winter*, 210 Kan. 597, Syl. ¶ 2). Brown acknowledged he and Mank spoke about the case and trial strategy (and Mank testified he sent Brown 30 letters keeping him advised of the case and what trial strategy might look like), and Mank's legal decision to pursue what he believed was the best strategy does not show a complete breakdown in communication. See *Bafford*, 255 Kan. at 895 (explaining an attorney has a duty to have a general discussion with the client about strategy and tactics). Brown does

not demonstrate Mank "shut down" his attempts at assistance; in fact, the record affirmatively indicates Mank consulted with Brown before making certain strategic decisions. The record certainly does not support Brown's allegation that Mank refused to communicate "'*at any level*.'"

We acknowledge that Brown disputes both the amount of communication and whether the communication was meaningful and allowed him to participate in his own defense, but the record simply does not corroborate his contentions. Even after Brown filed his motion for substitute counsel, he and Mank spoke about the case—as Brown himself acknowledged at the post-remand hearing. Mank, for his part, testified he met with Brown prior to the scheduled hearing on his motion for substitute counsel, at which point Brown told him that he was fine with Mank's representation if Mank could give his case full attention. See *Cromwell*, 253 Kan. at 504 (stating that if communication between a defendant and counsel is restored, it may be unnecessary to appoint substitute counsel); see also *McGee*, 280 Kan. at 897 (asserting that disagreement about the time spent on a case does not rise to the level of a conflict of interest). We are unconvinced by Brown's argument that his relationship with Mank at this point was irrelevant because he was convinced he had no other options. Brown was not entitled to counsel of his choosing. See *Banks*, 216 Kan. at 393. And the district court had a reasonable basis upon which to conclude that Brown had not shown justifiable dissatisfaction, there had not been a complete breakdown in communication, and Mank was still able to give effective aid in the fair presentation of a defense. See *Bryant*, 285 Kan. at 986.

Under different facts, we would be troubled by Brown's veiled contention regarding his right to testify in his own defense. See U.S. Const. amend. VI; see also U.S. Const. amend. V. A criminal defendant's decision whether to testify must not be left up to the lawyer; it is not a matter of mere trial strategy. See *Rivera*, 277 Kan. at 116-17. But we do not understand Brown's present argument to be that he was actually denied his

18

right to testify. See *Taylor v. State*, 252 Kan. 98, 103-04, 843 P.2d 682 (1992) (discussing a habeas petitioner's contention that he was "denied his constitutional right to testify in his own behalf through ineffective assistance of counsel"). Instead, Brown seems to be arguing that he listened to Mank about the wisdom of not testifying because he felt stuck with him—a contention which, as we outlined above, is not supported in the record. Brown was afforded an unambiguous opportunity to exert his right to testify, and the district court fully and carefully explained the decision to testify was a decision Brown—not his attorney—controlled. After this discussion, Brown declined to testify. As we explained above, there is a reasonable basis for the district court's decision that there had not been a complete breakdown in communication, and so Brown's subjective feelings about Mank did not amount to justifiable dissatisfaction. Indeed, Brown never stated Mank refused to let him exercise his right to testify; he only intimated Mank advised him it was probably not in his best interest—advice which Brown knew he was free to disregard because he was told as much by the district court.

In conclusion, we hold the district court did not abuse its discretion in determining that Brown did not carry his burden to show justifiable dissatisfaction with Mank. See *Stovall*, 298 Kan. at 370. The court had a reasonable basis for believing the attorney–client relationship had not deteriorated to a point where Mank could no longer effectively assist Brown in the fair presentation of a defense.

The district court's decision regarding Brown's motion is affirmed. This means we have now rejected all of Brown's attacks on his convictions and sentence made on direct appeal, and his convictions and sentences are now affirmed.

Affirmed.